CHESAPEAKE BAY FOUNDATION, INC. and Natural Resources Defense Council, Inc.

v.

BETHLEHEM STEEL CORPORATION

Civ. No. Y–84–1620.

United States District Court, D. Maryland.

Jan. 30, 1987.

James Thornton, New York City, and Scott Burns, Annapolis, Md., for plaintiffs.

Benjamin Rosenberg, G. Stewart Webb, Jr., and Jack L. Harvey, Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

The Chesapeake Bay Foundation (CBF) and the Natural Resources Defense Counsel (NRDC) filed suit against Bethlehem Steel Corporation for alleged violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (Clean Water Act), specifically Sections 301 and 402 of the Act, 33 U.S.C. §§ 1311, 1342. Plaintiffs claim that defendant has not complied with the waste water discharge limits contained in its National Pollutant Discharge Elimination System ("NPDES") permit. They seek injunctive relief and the imposition of civil penalties against defendant at the rate of $10,000 per day of each violation. This Court granted plaintiffs' motion for summary judgment as to defendant's liability for nearly all the incidents of noncompliance listed in the original complaint which occurred within the five-year period preced-

ing April 24, 1984,[1] and reserved the issue of remedies for a later date. *Chesapeake Bay Found., et al. v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 453 (D.Md.1985).

Plaintiffs subsequently amended their complaint on June 5, 1986, to allege hundreds of violations newly disclosed during discovery, and moved for summary judgment as to defendant's liability for the violations alleged in the amended complaint. Defendant responded with a motion to dismiss the amended complaint, asserting that the citizen suit provision of the Clean Water Act should be struck down because it violates the constitutional principle of separation of powers. This Court will first address defendant's motion to dismiss, and then resolve plaintiffs' motion for summary judgment. No hearing is necessary, Local Rule 6.

## I. MOTION TO DISMISS THE AMENDED COMPLAINT

■ Plaintiffs brought this action under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365, which provides in pertinent part:

> Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—
> (1) against any person ... who is alleged to be in violation of ... an effluent standard or limitation under this chapter....
>
> \*   \*   \*   \*   \*   \*
>
> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, ... and to apply any appropriate civil penalties under section 1319(d) of this title.

For purposes of standing, a citizen is a "person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). This Court previously ruled that both CBF and NRDC have standing under this section. *Chesapeake Bay Found., et al. v. Bethlehem Steel Corp., supra*, 608 F.Supp. at 446.

Defendant argues that the citizen suit provision violates the separation of powers principle by granting to private persons powers that are exclusively vested in the Executive Branch. Article II of the United States Constitution charges the President with responsibility for enforcing federal law. Defendant asserts that certain "core" executive functions may be performed only by Officers of the United States who are nominated by the President and confirmed by the Senate pursuant to the Appointments Clause of Article II, and argues that instituting a lawsuit to enforce federal law qualifies as such a core function. Thus, because the citizen suit provision allows persons who are not Officers of the United States to enforce the Clean Water Act through private litigation, defendant contends the provision contravenes the separation of powers.

This reasoning is fundamentally flawed. First, defendant bases its argument on two Supreme Court cases which address separation of powers vis-a-vis Congress and the Executive, not private persons and the Executive. Second, defendant ignores the principal that Congress creates statutory rights and obligations, and it determines who may enforce them and in what manner.

Defendant relies upon *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *Bowsher v. Synar*, —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), as support for its theory. *Buckley v. Valeo* involved, *inter alia*, a constitutional challenge to the composition of the Federal Election Commission. The Commission was established to administer and enforce the Federal Election Campaign Act. That act imbued the Commission with investigatory, rulemaking, and enforcement powers. Two *ex officio* members of the Commission were members of Congress, four Commission members were appointed by Congress, and the remaining two were appointed by the President. Because four of the six voting members were appointed by and beholden to Congress, the Supreme Court

---

**1.** The reported decision erroneously recorded August 24, 1984 as the cut-off date.

ruled that certain provisions of the Act violated the separation of powers doctrine:

> We hold that these provisions of the Act, vesting in the Commission primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights, violate Art. II, § 2, cl. 2, of the Constitution. Such functions may be discharged only by persons who are "Officers of the United States" within the language of that section.

*Buckley v. Valeo,* 424 U.S. at 140, 96 S.Ct. at 692.

Throughout its opinion, the Supreme Court stressed the fact that the separation of powers doctrine prohibited one branch from intruding into the sphere of another. "[T]he Legislative Branch may not exercise executive authority by retaining the power to appoint those who will execute its laws." 424 U.S. at 119, 96 S.Ct. at 681. "The Framers regarded the checks and balances that they had built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Id.* at 122, 96 S.Ct. at 684. The Supreme Court struck down certain provisions of the Federal Election Campaign Act because the provisions allowed Congress to exercise executive authority by appointing persons who would enforce the laws. Congress may not "vest in itself ... the authority to appoint officers of the United States when the Appointments Clause by clear implication prohibits it from doing so." *Id.* at 135, 96 S.Ct. at 690.

Thus *Buckley v. Valeo* concerned Congress aggrandizing itself at the expense of the Executive Branch. The opinion does not stand for the proposition, as defendant would have this Court believe, that private persons may not enforce any federal laws simply because they are not Officers of the United States appointed in accordance with Article II of the Constitution.

Similarly, *Bowsher v. Synar,* —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), does not support defendant's argument. There, the Supreme Court struck down a provision of the Gramm-Rudman-Hollings Act which provided that the Comptroller General would exercise necessary budget reductions:

> By placing the responsibility for execution of the Balanced Budget and Emergency Deficit Control Act in the hands of an officer who is subject to removal only by itself, Congress in effect has retained control over the execution of the Act and has intruded into the executive function. The Constitution does not permit such intrusion.

106 S.Ct. at 3192. Executive powers may not be entrusted to an officer who is subservient to or may be controlled by Congress, as was the Comptroller General. Private litigants, however, are hardly controlled by Congress. Consequently, the *Synar* decision lends no support to defendant's argument.[2]

To bolster its argument that only the Executive Branch has the power to bring suit to enforce federal law, defendant notes that the decision whether or not to bring a criminal enforcement action is within the sole discretion of the prosecuting attorney. While this may be true, it is irrelevant to the instant case. Plaintiffs CBF and NRDC have never contended that private persons may bring criminal actions. Morever, the doctrine of prosecutorial discretion cautions *courts* against interfering with the executive decision concerning criminal prosecution—again, a situation concerning the appropriate balance of power between coordinate branches of government.

---

**2.** *See also Melcher v. Federal Open Market Comm.,* 644 F.Supp. 510, 520 (D.D.C.1986) (*"Bowsher v. Synar* ... and *Buckley v. Valeo* ... dealt with congressional attempts to delegate executive powers to officers who were, in one fashion or another, beholden to the Congress. The Supreme Court, intent upon preserving the constitutional separation of powers imposed on the executive and legislative branches by the Founding Fathers, struck down what it regarded as congressional attempts to enlarge the legislative authority at the expense of that of the Executive Branch.").

Defendant also contends that citizen suits interfere with the Executive Branch's enforcement of the Clean Water Act. It argues that these suits force the Environmental Protection Agency or a state "to either participate in a citizens' suit or cede the government's interest in enforcement against that defendant to the citizens." (Defendant's Memorandum at 8.) In order to address this point, it is necessary to outline the statutory structure of the citizen suit provision.

Section 505 of the Clean Water Act, 33 U.S.C. § 1365, provides that no citizen suit may be commenced:

> (A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator [of EPA], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or
>
> (B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

The EPA Administrator, if not a party to a suit, may also intervene as a matter of right.

If a citizen brings suit and the Administrator chooses not to intervene, EPA does not simply "cede [its] interest in enforcement" as defendant contends. Rather, EPA looks to citizen suits to *supplement* enforcement because the EPA and state agencies lack sufficient resources to bring all necessary actions. "The United States considers the Section 505 'citizen suit' provisions a valuable adjunct to federal enforcement of the Clean Water Act." "Brief of the United States as Amicus Curiae in Support of the Constitutionality of Section 505 of the Clean Water Act" at 1–2, *Student Public Int. Research Group v. Monsanto*, 600 F.Supp. 1474 (D.N.J.1985).

(Attached as Exhibit A to Defendant's Memorandum.)

Defendant also argues that citizen suits unduly interfere with executive enforcement of the Act. This Court rejects that contention, in light of the fact that EPA and state agencies maintain primary responsibility for enforcing the Act. The Executive Branch itself does not believe that Section 505 of the Clean Water Act intrudes on its authority. "Section 505, as written, provides constitutionally sufficient protection to the enforcement interests of the Executive Branch. It expressly subjects citizen suits to federal prenotification requirements and to displacement by federal enforcement actions. It also provides that the federal government can intervene in the suit at any time. Furthermore, it vests the power to assess civil penalties strictly within the discretion of the courts." "Brief of the United States as Amicus Curiae", *supra*, at 13–14.

Finally, defendant contends that citizen suits are at odds with executive enforcement because the decision to commence an action should be the product of a variety of factors, including the rigidity of the permit limitations, understandings between the government and the permittee, and considerations of fairness, equity and national consistency, which private litigants are not likely to consider in their decisions to sue. This Court is not persuaded. Citizen suits may not be initiated until all notification requirements have been met. If a private suit truly interfered with national policy, the EPA Administrator would be entitled to intervene.

"Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition who may enforce them and in what manner." *Davis v. Passman*, 442 U.S. 228, 241, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846 (1979). Numerous federal statutes provide for concurrent enforcement by executive agencies and citizens.[3] The Supreme Court

---

**3.** *See, e.g.,* Clean Air Act § 304, 42 U.S.C. § 7604; Marine Protection, Research, and Sanctuaries

Act § 105(g), 33 U.S.C. § 1415(g); Noise Control Act § 12, 42 U.S.C. § 4911; Endangered Species

has implicitly approved the citizen suit provision, Section 505 of the Clean Water Act. *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 14–16, 101 S.Ct. 2615, 2623–24, 69 L.Ed.2d 435 (1981). Furthermore, Section 505 recently survived constitutional attack on a separation of powers argument similar to that put forth in this case. *Student Public Int. Research Group v. Monsanto Co.,* 600 F.Supp. 1474, 1478 (D.N.J.1985) (The argument "that Congress may only assign enforcement powers to the executive branch, exclusive of any other entity, ... is untenable.").

Because Section 505 of the Clean Water Act does not aggrandize the Legislative Branch at the expense of the Executive, and because Congress may determine who will enforce the statutory rights and obligations that it creates, the citizen suit provision of the Clean Water Act does not violate the constitutional principle of separation of powers. Accordingly, defendant's motion to dismiss the amended complaint is denied.

## II. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs have moved for summary judgment, seeking a declaration that defendant exceeded its NPDES permit limitations in violation of the Clean Water Act, as specified in paragraph 27 and Exhibits A through F of the amended complaint. The amended complaint adds new violations to the list of those occurring in the period covered by the original complaint (the five years preceding April 24, 1984), and "brings the action up to date" by citing violations alleged to have taken place since the original complaint was filed.

Plaintiffs calculated the additional violations by applying standard engineering equations to data obtained from defend-

ant's laboratory worksheets.[4] The only exceptions to this procedure are the new violations of dissolved oxygen and pH limitations, which measurements plaintiffs allege were transcribed from defendant's laboratory worksheets. Plaintiffs claim that this Court's prior ruling on defendant's liability resolves the issues relevant to the instant motion. *See Chesapeake Bay Found., supra,* 608 F.Supp. at 451–53.

### A. Defendant's Motion to Strike the Affidavit

■ Defendant opposes summary judgment and has moved to strike the affidavit of Patrick O'Malley submitted in support of plaintiffs' motion, on the ground that the affidavit fails to meet the standards set forth in Rule 56(e), Fed.R.Civ.P. Rule 56(e) outlines four requirements for an affidavit submitted in a summary judgment motion: (1) it must be made on personal knowledge, (2) it must set forth facts which would be admissible in evidence, (3) it must show that the affiant is competent to testify, and (4) sworn or certified copies of all incorporated documents must be attached.

O'Malley's affidavit clearly satisfies (1) and (3): the affiant swore that it was based on personal knowledge, and, as NRDC's project scientist in this litigation, he is competent to testify about matters in the affidavit. Problems arise, however, with requirements (2) and (4). The affiant refers to all violations cited in plaintiffs' amended complaint. Those lists of violations are not admissible without authenticated documents to support them, and plaintiffs originally submitted no documents with their motion for summary judgment.

Plaintiffs remedied this deficiency, however, in their opposition to defendant's motion to strike the O'Malley affidavit. Although plaintiffs did not submit all the

---

Act § 11(g), 16 U.S.C. § 1540(g); Deepwater Port Act § 16, 33 U.S.C. § 1515; Resource Conservation and Recovery Act § 7002, 42 U.S.C. § 6972; Toxic Substances Control Act § 20, 15 U.S.C. § 2619; Safe Drinking Water Act § 1449, 42 U.S.C. § 300j–8; Surface Mining Control and Reclamation Act § 520, 30 U.S.C. § 1270; and

Outer Continental Shelf Lands Act § 23, 43 U.S.C. § 1349(a).

**4.** These worksheets record the data that Bethlehem uses to calculate the effluent values it submits to government agencies in its Discharge Monitoring Reports.

laboratory worksheets from which they obtained data, defendant had submitted a number of them. More importantly, plaintiffs submitted the affidavit of Bruce Bell, which included a computer printout of the data plaintiffs used to make their calculations. Dr. Bell is vice president of Carpenter Environmental Associates, Inc. and a consultant to plaintiffs in this case. He is competent to testify, he has personal knowledge of the facts, the affidavit sets forth facts which are admissible in evidence largely because they are based on records kept in the regular course of defendant's business and defendant does not contest the accuracy of most calculations, and the affidavit includes documents which summarize the data obtained from Bethlehem's records. Plaintiffs used over 100,-000 pieces of information from defendant's records to make their calculations. It would be wasteful to require that they submit every lab report as well as their calculations in support of their motion for summary judgment.

Defendant's motion to strike the supporting affidavit is based on technicalities, and ignores the substance of the documents supporting plaintiffs' motion for summary judgment. Defendant recalculated its discharges, and it admits that the vast majority of plaintiffs' 701 discharge calculations in the amended complaint are correct. (*See* Affidavit of Joseph T. Mendelson, attached as Exhibit 1 to defendant's opposition to the summary judgment motion.) If the parties do not dispute the calculations upon which plaintiffs base their claims of permit violations, and this Court can decide as a matter of law whether those exceedances prove that defendant has violated the Clean Water Act, then considerations of judicial economy indicate that the parties need not retrace this ground in a trial. Accordingly, defendant's motion to strike the affidavit is denied, and this Court will consider plaintiffs' motion for summary judgment on the

violations alleged in the amended complaint.

### B. Defendant's Opposition to Summary Judgment

Bethlehem submits numerous arguments in opposition to plaintiffs' summary judgment motion. This Court will address each point seriatim.

#### (1) *The New NPDES Permit*

■ Defendant contends that plaintiffs' motion fails to meet the requisite evidentiary burden with respect to violations alleged to have occurred after a modified NPDES permit was issued on October 10, 1985. Plaintiffs did not attach a copy of the new permit to their amended complaint or to their summary judgment motion. Thus plaintiffs have not offered proof of what limitations are applicable to defendant's discharges under the new permit.

Summary judgment is appropriate only where the moving party clearly demonstrates that no issue of fact is involved, and inquiry into the facts is not desirable to clarify the application of the law. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). Because this Court does not know what discharge limitations were in effect after October 10, 1985, it cannot determine whether defendant has violated the modified permit. Accordingly, plaintiffs' motion for summary judgment is denied with respect to the violations which are alleged to have occurred after October 10, 1985. (Exhibit F to plaintiffs' amended complaint.)

#### (2) *Relation Back*

■ Defendant argues that many of the newly alleged violations are time barred because the amended complaint, filed on June 5, 1986,[5] does not relate back to the original complaint, and that only those violations occurring in the five years preceding June 5, 1986 are viable claims.[6] De-

---

**5.** Plaintiffs' motion to amend their complaint was granted on June 5, 1986.

**6.** This Court previously decided that five years is the appropriate statute of limitations. *Chesapeake Bay Found., et al. v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 446–50 (D.Md.1985).

fendant is incorrect. Rule 15(c), Fed.R. Civ.P., states, "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." Rule 15(c) is designed to allow the addition of new claims only if there is no unfair surprise or prejudice. *Fuller v. Marx*, 724 F.2d 717, 720 (8th Cir.1984). To determine whether a claim relates back, courts should look to the "operational facts" set forth in the original complaint to see whether that complaint gave defendant notice regarding the claim asserted in the amended pleading. *Hooper v. Sachs*, 618 F.Supp. 963, 977 (D.Md.1985).

The new violations described in paragraph 27 of plaintiffs' amended complaint are merely additional allegations of the same conduct—violating the NPDES permit limitations governing specified pollutants at given locations—for which defendant was sued in the first place. Defendant surely received adequate notice from the original complaint to avoid any unfair surprise or prejudice regarding the new allegations. Therefore, plaintiffs' amended complaint relates back to the original complaint, and this Court will consider all allegations of violations dating back to April 24, 1979.

### (3) *60–Day Notice Requirement*

■ Defendant contends that hundreds of allegations in the amended complaint never have been the subject of 60–day notice letters to the EPA, the state, or the defendant, and, consequently, plaintiffs should not be allowed to bring a citizen suit as to those violations.

Section 505 of the Clean Water Act provides that at least 60–days' notice of an alleged violation of a permit limitation must be given to (i) the Administrator of EPA, (ii) the state in which the violation occurred, and (iii) the alleged violator, before a citizen may bring suit. 33 U.S.C. § 1365(b)(1)(A). Plaintiffs satisfied this notice requirement before filing their original complaint. They did not file notice before amending their complaint. However, courts have adopted a pragmatic approach to the statutory requirement of 60–days' notice. *See Chesapeake Bay Found., supra*, 608 F.Supp. at 450. Dismissal of claims is not necessary where statutory notice is not given, as long as the defendant and the regulatory agencies involved had actual notice for more than sixty days. *Id.* All interested parties in this case received 60–days' notice prior to the original complaint. That surely put defendant and the government agencies on notice as to allegations of additional, but similar, violations of the NPDES permit which were alleged in the amended complaint. Accordingly, plaintiffs may bring a citizen suit as to the newly-alleged violations, at least with respect to those occurring before October 10, 1985.

Defendant might have a viable argument as to the alleged violations of the new NPDES permit issued on October 10, 1985, because the new permit was not the subject of the original 60–day notification. However, the amended complaint alleges a relatively small number of such violations. Moreover, defendant and the government are arguably on notice of all violations of Bethlehem's NPDES permit, old or modified, until this litigation is resolved. Because this Court previously determined not to grant summary judgment as to the violations alleged to have occurred after October 10, 1985 (see page ——, *supra* ), it need not resolve this particular question at this time.

(4) Finally, defendant contends that there are a number of genuine issues as to material facts.

### (a) *Res Judicata*

■ Defendant argues that plaintiffs are barred by res judicata from litigating alleged violations which were the subject of state enforcement proceedings concluded before plaintiffs brought suit. In *Student Public Int. Research Group v. Georgia-Pacific Corp.*, 615 F.Supp. 1419, 1432 (D.N. J.1985), the court ruled that a prior Con-

sent Judgment between EPA and the defendant foreclosed subsequent litigation as to all Clean Water Act violations adjudicated therein. In 1977, the Maryland Water Resources Administration and Bethlehem settled a civil enforcement action brought in the Maryland Circuit Court for Baltimore County for violations of Bethlehem's NPDES permit. The Consent Decree,[7] dated September 22, 1977, provided prospectively for penalties for exceedances at outfall 121[8] from January 1, 1979 "until Bethlehem attains such limitations." ¶ 7.C of the Consent Decree. Defendant claims that it did not attain such limitations until May 1980. Plaintiffs allege many violations at outfall 121 between April 1979 and May 1980 in their amended complaint, and defendant argues that they should be barred by res judicata.

*Georgia-Pacific, supra,* stands for the proposition that plaintiffs in the instant action are barred from litigating all claims adjudicated by the 1977 consent decree. *See also Menzel v. County Utilities Corp.,* 501 F.Supp. 354, 357 (E.D.Va.1979) ("under the doctrine of *parens patria* [sic], a state is deemed to represent all of its citizens, when the state is a party in a suit involving a matter of sovereign interest"), *rev'd on other grounds,* 712 F.2d 91 (4th Cir.1983). For the doctrine of res judicata to apply, there must have been a final adjudication by a competent tribunal. *Kutzik v. Young,* 730 F.2d 149, 151 (4th Cir.1984). Violations occurring at outfall 121 between January 1, 1979 and May 1980 were not *adjudicated* by the 1977 consent decree. The decree simply provided for penalties to be paid upon violation at outfall 121. Thus plaintiffs are not barred by res judicata, and they may sue for a declaration that defendant violated its permit governing outfall 121 between April 1979 and May

1980 (and beyond). The relevance of the penalty provisions in the 1977 consent decree to the penalties that will be established in this suit shall be determined at trial.

In a related argument, defendant contends that plaintiffs are barred from litigating violations covered by another consent decree. In December 1984, the State of Maryland initiated an administrative enforcement action against Bethlehem for violations at outfalls 013 and 121.[9] The exceedances alleged at outfall 013 occurred on thirteen dates between March 29, 1984 and August 17, 1984. None of plaintiffs' allegations of violations at outfall 013 fall on the same dates as those covered by the Maryland action. Thus, even though the administrative proceedings culminated in a consent decree executed in April 1985,[10] that decree did not adjudicate plaintiffs' claims with respect to outfall 013. Accordingly, plaintiff is not barred from pursuing those claims.

The violations alleged by the State of Maryland at outfall 121 included exceedances of cyanide in May 1984, of phenols in June 1984, and of total suspended solids in January, April and May 1984. Plaintiffs allege these same violations. However, it is unclear whether res judicata prohibits plaintiffs from suing for these violations at outfall 121. For res judicata to apply, there must be identity of parties and issues, as well as a final adjudication by a competent tribunal. *Kutzik, supra,* 730 F.2d at 151.

Plaintiffs CBF and NRDC were not parties to the Maryland administrative proceeding. It may be that the State of Maryland adequately represented their interests and thus their claims are now barred. Neither plaintiffs nor defendant address this

---

**7.** Attached as Exhibit B to the affidavit of James Thornton in support of plaintiffs' motion for partial summary judgment on the original complaint, filed on April 27, 1984.

**8.** An outfall is a point where waste water is discharged into the waterway.

**9.** The State's Notice of Violation is attached as Exhibit 2 to defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment on the Amended Complaint.

**10.** Attached as Exhibit 3 to defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment on the Amended Complaint.

issue with any particularity. Their briefs on the subject of res judicata contain conclusory generalizations. Therefore, this Court requests that the parties submit additional briefs on the question of whether res judicata bars plaintiffs from proceeding on their claims of the alleged violations at outfall 121 described above. The parties shall address at least the following questions: Were plaintiffs' legal interests sufficiently represented by the State of Maryland to satisfy the requirement of "identity of parties"? Was the final decision rendered by a "competent tribunal"? Do the policies underlying the "diligent prosecution" bar to a citizen suit influence the application of res judicata in this case?

### (b) *Diligent Prosecution by the State*

■ Section 505 of the Clean Water Act provides that citizens may not file suit if EPA or the state "has commenced or is diligently prosecuting a civil or criminal action in a court...." 33 U.S.C. § 1365(b)(1)(B). Defendant argues that the Maryland administrative proceeding described above is a diligent prosecution and should bar plaintiffs' action for the period covered by the Maryland enforcement proceeding. Plaintiffs' original complaint was filed on April 23, 1984, and Maryland issued its Notice of Violation on December 13, 1984. Because the Maryland action was commenced after plaintiffs brought suit, it does not bar the suit under Section 505. *Sierra Club v. Simkins Industries, Inc.*, 617 F.Supp. 1120, 1126 (D.Md.1985). Whether the Maryland proceeding has the effect of res judicata is another matter.

### (c) *The Upset Defense*

Defendant claims that many alleged violations are excused as "upsets." As shown in the annotated lists of alleged violations appended to this opinion,[11] defendant placed a "U" or a "*U*" next to all those violations it argues are upsets. This Court previously denied summary judgment on upsets alleged to be included in the original complaint. 608 F.Supp. at 453.

An upset is defined as "an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation." 40 C.F.R. § 122.41(n)(1).

Plaintiffs argue that defendant raises the upset defense with respect to a large group of violations for which this Court should hold the defense unavailable as a matter of law. Plaintiffs note that EPA has emphasized the exceptional and infrequent character of upsets: "[I]t must be stressed that upsets are exceptional events which should occur infrequently. The upset provision should not be construed as providing relief where there is a pattern of permit violations." 44 Fed.Reg. 32,863 (June 7, 1979).

■ The group of violations for which plaintiffs believe the upset defense unavailable as a matter of law took place at outfall 121 between January and April 1980. During that period, defendant had a consistent pattern of permit violations for phenols and total suspended solids (TSS). Defendant exceeded its permit limitations for phenol at outfall 121 nearly every day between January 9, 1980 and April 21, 1980, and exceeded its permit limitations for TSS at outfall 121 nearly every day between January 9, 1980 and March 25, 1980. This pattern of noncompliance is hardly "exceptional" or "temporary." Accordingly, the upset defense is not available for the violations of phenol and TSS limitations at outfall 121 described above. *See Student Public Int. Research Group v. Jersey Cent. Power*, 642 F.Supp. 103, 108 (D.N.J. 1986) ("[T]here is nothing 'temporary' about defendants' noncompliance with the 'effluent limitations' of its permit.... Accordingly, no 'upset' excuses or exclusions

---

**11.** The lists are annotated Exhibits A through F    to plaintiffs' amended complaint.

are available to the defendants to defeat the plaintiffs' summary judgment motion.").

■ As to the other alleged upsets, defendant has raised an issue of material fact sufficient to defeat summary judgment. In the prior summary judgment ruling, defendant was held liable for certain violations that it now argues are upsets. The decision on a summary judgment motion is a final disposition for res judicata purposes. *Adkins v. Allstate Ins. Co.,* 729 F.2d 974, 976 n. 3 (4th Cir.1984); *Pottratz v. Davis,* 588 F.Supp. 949, 954 (D.Md.1984). Defendant may not raise defenses now to the violations for which it has already been found liable. On the annotated list of violations, plaintiffs put a line through the letter "U" that defendant used to designate upsets, and placed an "L" next to the violation to indicate that defendant was previously held liable.

### (d) *The Bypass Defense*

■ Defendant argues that four of the alleged violations are excused as bypasses. Those are marked with a "B" on the annotated list of violations. Bypass means the intentional diversion of waste streams from any portion of a treatment facility. Defendant cites the bypass regulation, 40 C.F.R. § 122.41(m),[12] as controlling authority, but that citation is inapt because Bethlehem's permit contained a stricter bypass exception. The stricter state regulation controls. *See* Section 510 of the Clean Water Act, 33 U.S.C. § 1370; *Mianus River Preserv. Comm. v. Administrator, EPA,* 541 F.2d 899, 906 (2d Cir.1976).

■ Bethlehem's permit in effect through October 1985 provided on page 34:

*"Bypassing:* Any diversion from or bypass of facilities necessary to maintain compliance with the terms and conditions of the permit is prohibited; except when the precipitation event exceeds 5.1 inches in 24 hours as measured by the rain gauge located at No. 2 High Head pumping station." [13] The four dates claimed by defendant for bypasses are November 22, 1981, February 15 and 16, 1982, and June 29, 1983. Plaintiff has submitted reports from the National Weather Service for rainfall at BWI Airport, the nearest location for which the United States keeps such records. According to the National Weather Service, rainfall was not even close to 5.1 inches on the four days in question or the days immediately preceding. Thus, the bypass defense is unavailable to defendant.

### (e) *Disagreement as to Calculations*

■ Defendant recalculated its discharges, and it contends that the magnitude of certain exceedances is less than the amount alleged by plaintiffs. Those are marked with an "N" or "*N*" on the annotated lists. Although they may be smaller exceedances than plaintiffs alleged, defendant does not deny that they are still above permit limitations. Accordingly, defendant has effectively conceded its liability for those violations. The magnitude of the exceedances may be relevant when determining penalties, but the fact that they are smaller than plaintiffs alleged is no reason to deny the motion for summary judgment.

As to certain other alleged violations, defendant claims that its recalculations show that no exceedance in fact occurred. Those are marked with a "C" or "*C*". With respect to five of these, this Court's

---

**12.** That regulation provides in part as follows:
(4) *Prohibition of bypass.* (i) Bypass is prohibited, and the Director may take enforcement action against a permittee for bypass, unless:
(A) Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;
(B) There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have

been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance; and
(C) The permittee submitted notices as required under paragraph (m)(3) of this section.

**13.** A copy of the permit is attached as Exhibit A to the affidavit of James Thornton in support of plaintiffs' motion for partial summary judgment on the original complaint.

prior summary judgment opinion adjudicated defendant liable, and no defense is now available. 608 F.Supp. at 451–53. Such violations are marked with an "L" and the "C" is crossed out. However, defendant has made a sufficient showing that there is an issue of material fact with respect to the other alleged violations marked "C" or "*C*", therefore this Court will deny plaintiffs' motion for summary judgment as to those violations.

### (f) *The Technicon Autoanalyzer*

■ Defendant contends that in 1979–1980 and 1983–1986, it used an automatic instrument known as a Technicon Autoanalyzer to measure phenol at outfall 121. That technique was later proved inaccurate, and it yielded results 12–14 times higher than identical samples run manually. Defendant recalculated the phenol measurements listed in plaintiffs' amended complaint. Many would be substantially reduced in magnitude, which defendant marked with a "P" or "*P*". They still exceed permit limitations, however, and therefore offer no basis for denying summary judgment. Many others would be reduced below the permit limit, which defendant marked with a "Q" or "*Q*". Defendant has already been held liable for certain of these violations, and this Court will not now entertain its defense to them. Plaintiffs have drawn a line through defendant's notations and marked such violations with an "L".

This Court previously ruled that it will not accept claims of inaccurate monitoring as a defense to this action. 608 F.Supp. at 452. However, this Court acknowledged that errors in the testing procedure itself might constitute a defense. 608 F.Supp. at 453. Defendant has presented sufficient evidence to create an issue of fact regarding errors in the Technicon Autoanalyzer procedure, therefore this Court will deny plaintiffs' motion for summary judgment with respect to the recalculated phenol levels that do not exceed the permit limitations (those marked "Q" or "*Q*" and not crossed out and marked "L").

### (g) *Estoppel*

■ Defendant submits that the State of Maryland was closely monitoring it during the period January 1979 through July 1980, and that the state was aware of tests defendant was conducting and of the difficulties defendant encountered in adapting its new technology to the plant and meeting the permit limitations. Therefore, defendant argues, plaintiffs should be estopped from penalizing Bethlehem for exceedances which were caused by those tests. Defendant's argument is without merit. Only a diligent prosecution by the government precludes a citizen suit; estoppel by state inaction is no defense. *See* 33 U.S.C. § 1365(b)(1)(B).

### (h) *Impossibility Defense*

Defendant contends that permit limitations at outfalls 013 and 014 were later shown to be impossible to achieve, and it argues that all exceedances at outfall 013 should therefore be excused because of impossibility, as well as certain exceedances at outfall 014. The latter have been marked with an "X". Defendant supports its argument by stating that its new permit modified the limitations at issue.

Plaintiffs argue that compliance with a new permit is no defense to violations of a past permit. *See Student Public Int. Research Group v. AT & T Bell Labs.*, 617 F.Supp. 1190 (D.N.J.1985); *Sierra Club v. Aluminum Co. of America*, 585 F.Supp. 842 (N.D.N.Y.1984). While plaintiffs support this contention with persuasive authority, they do not directly address the question of whether or not there is a defense of impossibility in actions brought under the Clean Water Act. Therefore, this Court requests that plaintiffs and defendant submit further briefing on this issue, and will reserve decision on plaintiffs' motion for summary judgment with regard to those exceedances for which defendant claims the defense of impossibility.

### C. Summary

Summary judgment is denied with respect to: (i) Violations which are alleged to

have occurred after October 10, 1985; (ii) Exceedances for which defendant claims the upset defense, marked as "U" or "*U*" on the annotated lists, *except* for the exceedances of total suspended solids at outfall 121 between January 9, 1980 and March 25, 1980 and those of phenol at outfall 121 between January 9, 1980 and April 21, 1980; and (iii) The alleged violations marked "C", "*C*", "Q" or "*Q*". (Note that no defense is available as to those violations for which this Court previously held defendant liable. They are marked with an "L".)

The Court reserves judgment as to (i) the specific exceedances at outfall 121 which defendant claims are barred from relitigation by the 1985 consent decree; and (ii) all exceedances at outfall 013, and those at outfall 014 marked with an "X", which defendant contends are excused because of impossibility. The parties are instructed to submit additional briefs, as requested above, by February 11, 1987.

Summary judgment is granted as to defendant's liability for all other exceedances set forth in the amended complaint.

## III. CONCLUSION

For the aforementioned reasons, defendant's motion to dismiss the amended complaint and motion to strike plaintiffs' supporting affidavit are denied. Plaintiffs' motion for summary judgment on the amended complaint is granted in part and denied in part. The Court reserves judgment as to certain alleged violations pending submission of further briefs.