**NATURAL RESOURCES DEFENSE COUNCIL, INC., Plaintiff,**

v.

**OUTBOARD MARINE CORPORATION, Defendant.**

**No. 87C 4648.**

United States District Court, N.D. Illinois, E.D.

July 12, 1988.

James F. Simon, Nora J. Chorover, Natural Resources Defense Council, Inc., New York City, Lee A. Freeman, Jr., Freeman, Freeman & Salzman, P.C., Chicago, Ill., for plaintiff.

Richard J. Kissel, Erica L. Dolgin, Gardner, Carton & Douglas, Chicago, Ill., for defendant.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

Natural Resources Defense Council, Inc. ("NRDC") has sued Outboard Marine Cor-

poration ("OMC") for violations of the statute commonly referred to as the Clean Water Act (the "Act"), 33 U.S.C. §§ 1251–1376.[1] NRDC has filed under the Act's "citizen suit" provision (Section 1365) for claimed violations by OMC of its National Pollutant Discharge Elimination System ("NPDES") permit.

NRDC now seeks summary judgment under Fed.R.Civ.P. ("Rule") 56 on the issue of liability, plus a permanent injunction against further violations. OMC responds with a cross-motion seeking either summary judgment or dismissal or stay of the present action. For the reasons stated in this memorandum opinion and order, this Court:

1. denies OMC's motion to dismiss or stay the present action;

2. denies OMC's summary judgment motion;

3. grants NRDC's summary judgment motion in part, but denies its motion as to claimed violations involving polychlorinated biphenyls ("PCBs"); and

4. grants NRDC's request for an injunction against further violation of the permit's restrictions on the level of total suspended solids ("TSS") in, and the pH balance of, OMC's discharges.

*Facts* [2]

NRDC is a non-profit membership corporation with over 2,600 members in Illinois and 1,000 in Wisconsin. OMC is a Delaware corporation that manufactures, among other products, outboard and inboard motors. One of OMC's manufacturing facilities is located in Waukegan, Illinois. That facility discharges cooling water and storm water runoff into Lake Michigan, Waukegan Harbor and the North Ditch, a tributary of Lake Michigan (D. 12(e) ¶ 2 [3]). NRDC attacks 56 discharges by OMC at the Waukegan plant since April 1984.[4]

NRDC satisfied the jurisdictional prerequisites to a citizen suit under Section 1365 by giving more than 60 days' notice of the alleged violations to the United States Environmental Protection Agency ("EPA"), the Illinois Environmental Protection Agency ("IEPA") and OMC. When neither regulatory body commenced a civil or criminal action against OMC, NRDC became entitled to file suit (see Section 1365(b)(1)(B)).

Effluent discharges into navigable waters are strictly regulated by the Act. Such discharges must comply with any

1. In fact the Act's formal statutory title is the Federal Water Pollution Control Act. All further citations to Act provisions will take the form "Section—," referring to the Title 33 numbering rather than to the Act's internal numbering. Citations to federal regulations in 40 C.F.R. will take the form "Reg. § —," while citations to provisions of the Illinois Administrative Code tit. 35 (1985) will take the form "Code § —."

2. With cross-motions for summary judgment, this Court is in the Janus-like position of having to draw all reasonable inferences in favor of the nonmovant on each motion (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). Here the basic facts of the case are not in dispute. Where the parties do contest the relevant facts or their interpretation, this opinion will note the conflict.

3. This opinion refers to the parties' submissions as follows (in each instance "P." signifies NRDC and "D." signifies OMC):

 1. Each memorandum will be identified by the party filing it, then by its place in the filing sequence by that party (indicated by a Roman numeral) and finally by the page reference.

2. Submissions under this District Court's General Rules 12(e) and (f) will be identified by the party, the rule and the paragraph in the submission.

3. Affidavit and deposition references will specify the name of the affiant or deponent followed by the nature of the source ("Aff." or "Dep.") and the relevant paragraph or page.

4. Any other exhibit will be referred to by identifying the party submitting it, followed by "Ex." and then the letter or number that party assigned to the exhibit.

4. P.Mem. I–6–7 and P.Ex. C specified 56 claimed violations between April 1984 and August 1987. Then NRDC's June 1, 1988 letter adverted to two more alleged violations in December 1987. However, when OMC had earlier explained two of the purported violations in March 1987 were simply clerical errors (D.Mem. I–38), NRDC withdrew its claims as to those two incidents (P.Mem. II–5). That left a net of 56 claimed violations (although NRDC inexplicably still used the 58–violation figure in its later June 1 letter).

NPDES permit issued by EPA, or by the relevant state agency when EPA has delegated that responsibility to the state. In this case IEPA originally issued an NPDES permit to OMC on September 29, 1981, then reissued the permit in modified form on September 15, 1983. Under the permit OMC was required to submit monthly Discharge Monitoring Reports ("DMRs") indicating OMC's compliance (or noncompliance) with the appropriate effluent standards. Those DMRs form the basis for all NRDC's claims of violations.

NRDC's charges deal with three of the effluent standards (or "parameters") established by the permit. Most of the claimed violations involve PCBs. There is a dispute as to what restrictions the permit imposed in that respect:

1. NRDC maintains the permit imposed a strict limitation on PCBs of one part-per-billion (ppb),[5] both as a daily maximum and as a ceiling on average daily discharges over each 30-day period at five separate discharge locations (or "outfalls").

2. OMC contends the 1.0 ppb limitation was not an enforceable numerical limitation on PCB discharges but must be read in conjunction with the permit's "Special Condition 15," which (a) required OMC to institute a "best management practices" ("BMP") program governing PCB discharges and (b) allowed for possible modification of the effluent standard if the BMP program could not meet the 1.0 ppb standard.

NRDC also charges OMC has violated the permit limits for the discharge of TSS, a measure of the "particulate matter, both organic and inorganic, in water" (P.Mem. I–10). On that score the parties agree that OMC was limited to a 15 milligram per liter ("mg/l") standard for daily maximum discharges at two of its outfalls (P. 12(e) ¶ 6, D. 12(e) ¶ 7).

Finally NRDC claims violations of the standards set by OMC's permit for the pH balance (a measure of the alkalinity or acidity level) of OMC's discharges at several of the outfalls.[6] In that respect the parties dispute whether the pH limits applied at the relevant times to outfalls 015 and 016.

So much, then, for the nature of NRDC's charges here. To return to the relevant sequence of events, after IEPA reissued the NPDES permit in September 1983 OMC proceeded to implement a BMP program (which was approved by IEPA) to control PCB discharges (D. 12(e) ¶ 9). OMC contends its BMP program, while able to achieve significant PCB discharge reductions, was unable to guarantee a 1.0 ppb standard on a daily basis (id.). OMC was also concerned that at such low levels of concentration[7] the current monitoring technology could not offer accurate readings of the true PCB level in OMC's discharges (D.Mem. I–37–38). On April 18, 1984 OMC notified IEPA it could not meet its PCB target through its BMP program, and on September 6, 1984 it requested modification of the PCB standard to 10.0 ppb (D. 12(e) ¶ 9). OMC apparently received no response from IEPA to that modification request before the permit expired at the end of June 1986.

In September 1986 IEPA issued a "notice and fact sheet" for a renewed discharge permit for OMC, proposing a PCB standard of 1.0 ppb without a BMP special condition. OMC objected to omission of the BMP provision, while EPA objected to the standard itself, proposing instead a one part-per-trillion (ppt) limit. When IEPA reissued OMC's permit effective October 14, 1987 (D.Ex. B–1), it did not include the BMP program special condition and called for a staged reduction in the PCB limit:

1. Through August 1, 1991 the level remained at 1.0 ppb (id., at 2–3).

---

5. P.Mem. I–6 n. 4 erroneously defines the one milligram per liter limitation as the equivalent of one part-per-*million.* At all other times NRDC correctly refers to a part-per-*billion* standard, and this opinion will do the same throughout.

6. Under the permit the pH level was to be maintained between 6.0 and 9.0.

7. D.Mem. I–7 n. 2 says a 1.0 ppb concentration is equivalent to "one drop from an eyedropper in a pool of water 25 feet long, 12 feet wide, and 6 feet deep."

2. From then until the permit's expiration on August 1, 1992 the limit would be reduced to 0.1 ppb (*id.*, at 4–5).

Special Condition 1 to the permit told OMC the final PCB target was set at 1.0 ppt, but that goal was not enforceable during the life of the permit (*id.*, at 6).

On October 14, 1987 OMC appealed to the Illinois Pollution Control Board ("Board"). · It challenged the numerical PCB limits, including the elimination of the BMP special condition, and the continued restrictions on TSS discharges at outfalls 015 and 016 (D.Ex. B, at 6–8). Its appeal also attacked Board's denial of OMC's earlier request for modification of the 1983 permit (*id.*, at 10). OMC tells this Court IEPA has not yet set a hearing date on the appeal, but Board has scheduled a decision for November 1, 1988 (D. 12(e) ¶ 12).

## Contentions of the Parties

NRDC argues that OMC's DMRs have conclusively admitted over 50 violations of the permit since April 1984. NRDC therefore seeks a declaration that OMC has violated the Act, a determination of OMC's liability and a permanent injunction against further violations.

OMC responds both with threshold attacks on this Court's consideration of the case and with counterassertions on the merits. On the first score OMC says:

1. NRDC lacks standing to pursue a citizen suit against OMC.

2. This action should be dismissed or stayed under the doctrines of primary jurisdiction or abstention.

3. NRDC's challenges to PCB discharges and pH level violations should be dismissed for lack of jurisdiction under *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.,* —— U.S. ——, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) because those violations are neither ongoing nor intermittent.

4. Section 1365's citizen suit provisions violate separation of powers principles by giving private parties outside the

Executive Branch responsibility for the execution of law.

On the merits OMC urges:

1. OMC is entitled to summary judgment on the PCB discharges because it has complied with the permit restrictions, which do not impose an enforceable numerical limit.

2. If not, NRDC's motion for summary judgment as to PCBs should be denied because of the existence of factual issues as to whether violations of any PCB limits have occurred (OMC points to the problem of monitoring variability and double-counting of eight alleged violations by NRDC[8]).

3. Even if this Court finds OMC has violated permit restrictions, no injunctive relief should be granted.

## Standing

■ OMC's first preemptive strike is an attack on NRDC's standing to sue. OMC says the injury NRDC and its members allege is insufficient to satisfy standing doctrines in areas such as the existence of any actual harm sustained by them, the connection of any such claimed harm to OMC and the potential redressability of such harm. OMC also contends NRDC's standing is undermined because the organization did not communicate with the individual members now identified in support of its standing until after NRDC had filed suit.

Article III limits federal courts to the resolution of actual cases or controversies —a restriction that in part incorporates the notion that litigants must have a sufficient connection to the tendered dispute. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted) summarized the standing requirements:

[A]t an irreducible minimum, Art. III requires the party who invokes the court's

---

**8.** As n. 4 reflects, OMC also argued two claimed violations were actually just reporting errors,

and NRDC has now dropped these claims.

authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," ... and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision,"....

Here NRDC relies on the now familiar concept of representational standing just reconfirmed in *New York State Club Association, Inc. v. City of New York*, ― U.S. ―, ―, 108 S.Ct. 2225, 2231–32, 101 L.Ed.2d 1 (1988):

> In *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), we held that an association has standing to sue on behalf of its members "when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." See also *Automobile Workers v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986).

If NRDC's members are sufficiently injured, it may represent those members in this action (see *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972)[9]). And of course such cognizable injury can implicate environmental, aesthetic or recreational, as well as economic, interests.

NRDC's standing must also be authorized under the Act. Section 1365(a) says "any citizen may commence a civil action" under the Act, and Section 1365(g) in turn defines "citizen" as "a person or persons having an interest which is or may be adversely affected." *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 16, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981) (citations omitted) teaches "this phrase was intended by Congress to allow suits by all persons possessing standing under this Court's decision in *Sierra Club v. Morton....*"

NRDC's Complaint ¶ 7 alleges its members reside in the vicinity of Lake Michigan, Waukegan Harbor and the North Ditch, utilize those water resources and are being adversely affected by OMC's violation of its NPDES permit. NRDC supports those allegations with the affidavits of two organization members, Tina Santopoalo ("Santopoalo") and Steven Wallerstein ("Wallerstein"). Both live in the vicinity of Waukegan Harbor (Santopoalo Aff. ¶ 3; Wallerstein Aff. ¶ 3). Both use the affected waterways by walking along the shores or swimming (Santopoalo Aff. ¶ 4; Wallerstein Aff. ¶¶ 4–5). Both state their concern about the condition of the water in North Ditch, Waukegan Harbor and Lake Michigan, believe their ecological, health and recreational interests are affected by pollution of those waters and hope to see the resources cleaned up (Santopoalo Aff. ¶¶ 6, 8–9; Wallerstein Aff. ¶¶ 7–9).

OMC argues those affiants fail to satisfy the standing requirements of such cases as *Morton* by not demonstrating through their affidavits and later depositions that they have personally suffered an injury from OMC's putatively illegal discharges. OMC characterizes NRDC's members as merely concerned about pollution of the affected waterways generally, with their alleged injuries neither fairly traceable to OMC's conduct nor redressable by the relief sought in this case.

Understandably OMC cites no case in which a court has held similar showings insufficient for standing under the Act. Its argument stems from a basic misunderstanding of the type of injury NRDC and its members need to demonstrate. It is enough for NRDC to show its members use the water into which OMC's allegedly illegal discharges flow (see, e.g., *Sierra*

---

**9.** Because citizen suits are frequently brought by organizations such as Sierra Club and Student Public Interest Research Group, this opinion will sometimes employ the defendant's rather than the plaintiff's name by way of a later shorthand reference to a previously-cited case in the text discussion (as for example using the name *Morton* to refer to the case just cited in the text). That same usage of referring to the defendant will be followed where the United States is plaintiff.

*Club v. SCM Corp.*, 747 F.2d 99, 107 (2d Cir.1984) (standing could be established by "a concrete indication that Sierra Club or one or more of its members used the Wolcott Creek tributary or would be affected by its pollution")). Such standing·is not undermined because NRDC's members have not explicitly said they are harmed by OMC's permit violations. It is enough that they identify harm to their aesthetic or environmental interests from the· overall pollution of the waterways. If OMC is proved to be violating the terms of its permit, that alone constitutes injury to those using the affected waters (see *Student Public Interest Research Group of New Jersey v. Georgia–Pacific Corp.*, 615 F.Supp. 1419, 1424 (D.N.J.1985) ("The Clean Water Act presumes unlawful discharges to reduce water quality because definite proof of the proposition is often nearly impossible")).

Any requirement that NRDC must prove its members are harmed by discharges specifically traceable to OMC would "virtually emasculate the citizen's suit provision by making it impossible for any plaintiff to demonstrate standing" (*Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 446 (D.Md.1985)). Indeed, such a causation standard would compel a stricter showing for standing than for liability under the Act, where proof of a permit violation is sufficient (*Georgia–Pacific*, 615 F.Supp. at 1424). Thus NRDC demonstrates the necessary link between OMC's activities and the identified injury to NRDC's members as long as it can prove OMC's permit violations. Relatedly it follows that proof of such violations will suffice to couple the redress of NRDC's members' injuries with this Court's enjoining or penalizing of the violations.

OMC's final standing argument complains of NRDC's having filed this action before it obtained authorization from the members on whom standing . depends. OMC urges that because Santopoalo and Wallerstein were unaware of the suit and of OMC's permit violations until after suit was brought, NRDC lacked standing at the time of filing. OMC points to (1) cases holding an Article III case or controversy must exist at all times during a lawsuit and (2) class action cases holding a named plaintiff must have standing when a suit is filed (see, e.g., *Sosna v. Iowa*, 419 U.S. 393, 401–02, 95 S.Ct. 553, 558, 42 L.Ed.2d 532 (1975)). But none of the authorities OMC cites involves the concept of representational standing analogous to NRDC's position here.

OMC may well be right that NRDC must demonstrate it had standing at the time of filing, but nothing here suggests that was not so. Both affiants were NRDC members and lived in Waukegan before the May 1987 filing of this suit (Santopoalo Dep. 4–5; Wallerstein Dep. 4–5). Although neither expressly says his or. her use· of the affected · water resources predates this case, that is clearly implied by their affidavits and depositions (and OMC has not argued to the contrary). Thus NRDC clearly satisfied the requirements for representational standing when it brought suit. Whether Santopoalo and Wallerstein were aware of the impending lawsuit and. of OMC's specific alleged· permit violations is immaterial to whether standing *existed* at the time of filing.[10]

Only one case has been located by the litigants (and this Court has found no others) discussing when an organization must communicate with the members on whom it relies for standing. In *Sierra Club v. Aluminum Co. of America ("Alcoa")*, 585 F.Supp. 842, 849–53 (N.D.N.Y.1984) Alcoa challenged Sierra Club's Article III standing as the representative of its members. It argued Sierra Club could not be acting

---

**10.** D.Mem. II–23 n. 9 also *questions whether* NRDC violated Rule 11 by alleging in Complaint ¶ 7 that the "interests of [its] members have been ... adversely affected" by OMC's permit violations when NRDC had not yet communicated with any individual members. Whether or not it would have been preferable for NRDC to verify before filing that one or more of its members used the affected waterways, it was reasonable for NRDC to make the good faith assumption (in both subjective and objective terms) that substantial numbers of such persons existed and at least some would be found quickly among NRDC's 2,600 Illinois and 1,000 Wisconsin members.

as a representative when it did not reach any of its members until after the suit was filed. That argument was rejected on the strength of the general principles of associational standing articulated in *Hunt* (principles just reaffirmed in *New York State Club Association* and quoted earlier in this opinion).

NRDC plainly satisfies those three requirements quoted from *Hunt*. *Alcoa* provides further support for a ruling that prefiling contact with the identified individual members was unnecessary to confer standing.[11] This Court so holds.

### Primary Jurisdiction; Abstention

OMC seeks the stay or dismissal of this action under the doctrines of primary jurisdiction or abstention. It urges this Court, at a minimum, to delay consideration of the merits in deference to IEPA's and Board's control over the substance of OMC's permit and to the pending appeal before Board of (1) the terms of OMC's 1987 permit and (2) the denial of OMC's modification request on 1983 permit. OMC addresses those arguments to NRDC's claims as to PCB and TSS standards, now in issue before Board.[12]

■ Primary jurisdiction doctrine is principally concerned with the timing of judicial review of matters entrusted to the discretion and expertise of administrative agencies (see this Court's opinion in *Car Carriers, Inc. v. Ford Motor Co.*, 583 F.Supp. 221, 229 (N.D.Ill.1984), *aff'd*, 789 F.2d 589 (7th Cir.1986)). *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)(citation omitted) explains:

"Primary jurisdiction," ... comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

■ That concept is simply inapplicable here. To determine whether OMC has violated its NPDES permit, this Court will have no need to resolve issues "within the special competence" of IEPA or Board. It will not be called upon to set the effluent limits governing OMC or to consider technical issues rightly left to the Illinois regulatory authorities, as D. Mem. II–12 would have it. Instead this Court is asked to enforce the standards IEPA has already determined are appropriate (see *Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Co.* ("*Monsanto II*"), 600 F.Supp. 1479, 1483 (D.N.J.1985)). That involves no encroachment on IEPA's or Board's areas of expertise. They have already exercised their regulatory role by determining OMC's effluent restrictions, and the procedure designed by Congress requires this Court to enforce those restrictions (see Section 1319(b)).[13]

Courts that have considered primary jurisdiction arguments in the context of citizen enforcement suits have uniformly rejected the position OMC advances (see, e.g., *Student Public Interest Research Group of New Jersey v. Fritzsche, Dodge & Olcott, Inc.*, 579 F.Supp. 1528, 1537–38 (D.N.J.1984), *aff'd*, 759 F.2d 1131 (3d Cir.1985)). By contrast *Montgomery Environmental Coalition Citizens Coordinating Committee on Friendship Heights v. Washington*

---

**11.** P.Mem. III–5–6 cites to *Alcoa* much as if it were precedent binding this Court. That of course would be nonsense: No conclusion reached by another District Judge (and from another judicial circuit at that) can serve as more than persuasive authority. In this instance Judge Miner's *Alcoa* opinion is indeed persuasive, but by the force of its reasoning rather than by force of law.

**12.** OMC's primary jurisdiction and abstention arguments do not target NRDC's claims involving violation of pH standards.

**13.** Nor is this Court required to consider highly technical issues more appropriately left to IEPA or Board. As this opinion later demonstrates, the sole technical issue posed by this litigation concerns the accuracy of monitoring systems for PCB discharges. That question is no different in kind from disputed matters with which courts (or juries) deal on a regular basis. It does not require interpretation of the legislative mandate and policy considerations that might merit deferral to the Illinois authorities.

*Suburban Sanitary Commission,* 607 F.2d 378 (D.C.Cir.1979)—the one authority advanced by OMC—did not involve the enforcement of an existing NPDES permit. Instead the federal court, called upon to decide the appropriate discharge level for a sewage treatment plant (*id.* at 379), deferred in favor of a pending action before the EPA over an NPDES permit for the plant—an action that offered the possibility of resolving many of the issues in the federal suit (*id.* at 381–82). That situation is totally different from the present one, which demands only the enforcement of a permit that already sets the relevant effluent limits.

Next OMC invokes two abstention doctrines as the bases for stay or dismissal: *Burford* abstention (see *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)) and *Colorado River* abstention (see *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). Each will be discussed in turn.

■ *Board of Education of Valley View Community Unit School District No. 365U v. Bosworth,* 713 F.2d 1316, 1320 (7th Cir.1983) has described *Burford* abstention this way:

> In *Burford,* the Court approved a district court's decision to dismiss a complaint involving the state's complex oil conservation scheme, because of the dangers of hindering the development of coherent state policy and interfering with its comprehensive administrative scheme administered by a specialized tribunal.

That description does not fit the area of water pollution, where Illinois and federal policy must work hand-in-hand (Section 1319). Under the Act, Congress has not designated the state as the exclusive repository of authority or expertise (*United States v. Cargill, Inc.,* 508 F.Supp. 734, 746–47 (D.Del.1981)).

No reported decision has ever accepted a *Burford* abstention argument to defer a federal permit enforcement action. *Cargill, id.* found such abstention "singularly inappropriate" to an enforcement action under the Act, given the pervasive federal system of regulation in the area. True enough, state enforcement and administration of water pollution controls are also authorized by the Act, but they are governed by specific requirements of federal law (*id.*). Another district court summarily rejected abstention because of the congressional intent that citizen suits should supplement state governmental action (*Student Public Interest Research Group of New Jersey, Inc. v. P.D. Oil & Chemical Storage, Inc.,* 627 F.Supp. 1074, 1085 (D.N. J.1986)).

■ Only one aspect of this case merits a further look in *Burford* terms: the possibility that OMC's pending appeal before Board may alter the permit terms this Court is now being asked to enforce. That could potentially subject OMC to conflicting legal requirements, just as this Court might conceivably penalize OMC for past violations as to which Board might then modify the permit retroactively. OMC contends abstention to await Board's determination would avert both those possibilities and serve the *Burford* goal of maintaining a coherent state policy.

Several factors militate against that position. First, *Colorado River,* 424 U.S. at 816, 96 S.Ct. at 1245 tells us "the mere potential for conflict in the results of adjudications" does not of itself mandate abstention. Second, OMC's current appeal does not stay the effect of the restrictions at issue here:

1. Its appeal of the 1987 permit stays the effect of those contested provisions but leaves the expired 1983 permit in effect (Reg. § 124.60(c)(1); Reg. § 122.6).[14]

2. Its request for modification of the 1983 permit's restrictions on PCBs also

---

**14.** This assumes that OMC's *state*-issued NPDES permit is governed by the Code of Federal Regulations. Both parties have cited to those regulations, and their applicability is supported by the Illinois statutory provision that all Board regulations governing NPDES permits "shall be consistent with the applicable provisions of such federal Act and regulations pursuant thereto . . ." (Ill.Rev.Stat. ch. 111½, ¶ 1013(b)(1)).

does *not* suspend the contested 1983 terms,[15] as Reg. § 122.41(f) specifies:

> The filing of a request by the permittee for a permit modification ... does not stay any permit condition.

Third, the Supreme Court has stated in the related context of the Clean Air Act that the request for a variance "is carried out on the polluter's time, not the public's," so that the offender remains liable for violations while a request is pending (*Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 92, 95 S.Ct. 1470, 1488, 43 L.Ed.2d 731 (1975)).

In sum, this Court is obliged to enforce all permit restrictions that remain in effect, without regard to the possibility that the Board will retroactively modify the 1983 permit.[16] It will be time enough to take that prospect into account in assessing penalties for past violations (if any are in fact found) and in weighing injunctive relief (see *Monsanto II*, 600 F.Supp. at 1486, holding a pending modification request is more appropriately addressed at the penalty stage).

OMC's *Burford* argument is even less convincing as to TSS violations. In that area Special Condition 22 to the 1983 permit provided (D.Ex. B–2, at 12) (emphasis added): ·

> If the permittee, after monitoring Outfalls 015 and 016 for one year after the effective date of this Permit for total suspended solids can demonstrate to the satisfaction of the permitting authorities that there is no significant discharge of total suspended solids and in addition, the effluent standard set in this Permit has not been exceeded, *upon written request by the permittee*, the permitting authority shall review the monitoring requirement and may, at its discretion, revise or waive such monitoring requirement by letter without public notice or opportunity for hearing.

Those restrictions were carried over into the 1987 permit by IEPA, and OMC has objected to that continuation as part of its appeal of the 1987 permit. OMC asserts the possibility of Board modification or removal of the TSS restrictions supports this Court's abstention from considering alleged TSS violations.

That argument fails for the reasons already discussed as to the PCB requirements. But there is more. Although OMC's 1983 permit allowed it to seek modification of the TSS limitation, it does not claim to have done so. That being so, there seems no reason for Board, on OMC's present permit appeal, to modify the TSS requirements for the pre–1987–permit period. And of course any possibility that Board will modify the TSS requirements *for the future* does not warrant abstention as to violations of the presently operative provisions.

So much, then, for *Burford* notions. OMC fares no better in bringing itself within *Colorado River* abstention principles. There a federal court water rights suit was dismissed because of pending parallel state court litigation (424 U.S. at 817–20, 96 S.Ct. at 1246–48). En route to that decision the Supreme Court considered such factors as the clear federal policy against piecemeal adjudication of water rights, the order in which the state and federal courts had obtained jurisdiction and the relative convenience of the two fora (*id.* at 818–20, 96 S.Ct. at 1246–48; see also *Cargill*, 508 F.Supp. at 749 (discussing various relevant factors)).

■ No such weighing of relevant factors is required here, because the basic prerequisite to this form of abstention—a parallel state judicial proceeding—is entirely absent. As in *Colorado River* itself, lower courts that have considered such abstention have been faced with concurrent

---

**15.** As will be discussed shortly, OMC does assert its modification request is equivalent to an appeal of the permit sufficient to stay the 1.0 ppb PCB limitation (D.Mem. II–6 n. 3). For present purposes, however, it is assumed the 1.0 ppb standard remains an enforceable limit.

**16.** OMC assumes without any discussion that Board can grant retroactive modification of the 1983 permit. But cases that have touched on this issue have concluded such retroactivity is *not* authorized (see, e.g., *Fritzsche, Dodge & Olcott*, 579 F.Supp. at 1538). That question need not be resolved at this juncture.

state enforcement or abatement actions (see *Cargill*, 508 F.Supp. at 744–45;[17] *Connecticut Fund for the Environment, Inc. v. Upjohn Co.*, 660 F.Supp. 1397, 1402–04 (D.Conn.1987)). OMC's permit appeal before Board is not equivalent to an enforcement action. Board is considering OMC's request for modification of its permit but is not evaluating whether permit violations have occurred and, if so, what penalties should be assessed. OMC makes no response to NRDC's argument that no adequate parallel state proceeding exists, and it has offered no authority for abstention absent such a proceeding.

In sum, this Court rejects all OMC's arguments for stay or dismissal of this action. OMC has not met the heavy burden imposed on a party asking a court to decline the exercise of its jurisdiction (see *Connecticut Fund*, 660 F.Supp. at 1404, citing *Landis v. North American Co.*, 299 U.S. 248, 255, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936)).

### Are There Continuous or Intermittent Violations?

Under *Gwaltney*, 108 S.Ct. at 385 citizen suits under Section 1365 of the Act can be maintained only when "citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation" of the Act. In that respect NRDC asserts OMC's violations continued after NRDC notified OMC of its intent to sue in February 1987 *and* after NRDC filed suit in May 1987 (P.Mem. I–20).

■ In its turn, OMC invokes *Gwaltney* to attack this Court's jurisdiction over NRDC's claims of PCB and pH violations. OMC claims PCB violations (if any occurred) have ceased because its October 1987 appeal of IEPA's denial of OMC's modification request stayed the contested

1.0 ppb PCB limit. In OMC's view that stay meant the operative PCB unit is now 10.0 ppb (the interim PCB target in effect until the 1.0 ppb limit became operative, D.Ex. B–2, at 2–3 and Special Condition 14), a standard OMC has always satisfied. As to the pH violations, OMC claims it has exceeded the pH standards only three times in more than three years. In *Gwaltney* terms, OMC says violations of the pH limits are certainly not "continuous" and are too infrequent to qualify as "intermittent."

At the outset it is useful to examine *Gwaltney* briefly. That case sets up a jurisdictional threshold, much like the standing requirement, that a plaintiff must satisfy to bring suit under Section 1365. Because *Gwaltney* defines that threshold in terms of a plaintiff's good faith *allegations* rather than *proof,* and because Justice Marshall's opinion for the Court (108 S.Ct. at 385) specifically rejects the "argu[ment]" that citizen-plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches under § 505 [Section 1365]," all that is necessary to overcome OMC's jurisdictional onslaught is a confirmation of the bona fides of NRDC's allegations.[18] To be sure, a showing by OMC that it has since begun to comply with the Act would pose a potential for mootness (*id.* at 386)—one that this opinion may also profitably examine (and does later), given the summary judgment context of the present motions.

As for the asserted PCB violations, to a large degree this opinion has already discussed the effect of OMC's appeal of the 1987 permit issued by IEPA: That timely appeal stayed the contested PCB terms in favor of those in the pre-existing 1983 permit (see Reg. § 124.60(e)). By contrast, a request to *modify* an existing permit normally does not stay the permit conditions

---

17. *Cargill* in fact noted that the state environmental agency had requested EPA not to file a federal enforcement action because it would interfere with an abatement program on which the state and Cargill had agreed (508 F.Supp. at 744).

18. This reading is buttressed by the three-Justice concurring opinion authored by Justice Scalia

(*id.* at 386–88), which differs sharply with what it terms the "jurisprudential anomaly" (*id.* at 387) produced by the majority's jurisdictional approach. Under the concurrence the jurisdictional question is "whether the petitioner was in fact 'in violation' on the date suit was brought" (*id.* at 387).

pending a decision on the request (Reg. § 122.41(f)). Thus the regulations differentiate between permit appeals and modification requests: Permit appeals trigger a stay,[19] while requests for modification do not. For *Gwaltney*-analysis purposes, this Court must decide whether OMC's appeal of its modification request should be classified as an appeal or a modification request for purposes of its effect on the contested PCB standards.

OMC says it could have appealed the 1983 permit restrictions on PCBs only after its request for permit modification was denied (D.Mem. II–6 n. 3).[20] From that premise it contends the 1987 appeal is equivalent to an appeal it might have taken when the permit was originally issued in 1983 (D.Mem. I–40). In that respect Special Condition 15 to the 1983 permit read (D.Ex. B–2, at 9):

### Final Polychlorinated Biphenyls Limits (PCBs)

The IEPA does not envision treatment equipment as being the method to meet the 1.0 ppb final limitation for PCBs. During the interim period various alternative methods will be evaluated as to their ability to meet final limitations. If treatment equipment is installed a construction permit must be obtained from the IEPA.

This permit defines best available treatment economically achievable (BAT) by a best management practices (BMP) program. If after the final compliance date listed herein, the BMP program has been approved and implemented and the Permittee can demonstrate that the final PCB limit of 1.0 ppb is not technically feasible or economically reasonable for any or all of the outfalls, despite the implementation of the BMP program, this Permit shall be subject to modification. The Permit may be modified to include effluent conditions as achieved under the BMP program or other alternative reductions in effluent conditions beyond those achieved by the BMP program. By accepting the effluent limitations for PCB's in this permit, the permittee does not concede that reductions in effluent conditions beyond those achieved by the BMP program may be required. If the permittee disagrees with the IEPA's determination of what the effluent limitation for PCB's shall be from any outfall, the permittee may seek review of IEPA's decision before the Pollution Control Board. Such a review must be sought in accordance with Part V: Permits of Chapter 1: Procedural Rules of the Board's rules.

It appears that the reference to seeking review of the PCB effluent limits "in accordance with Part V: Permits of Chapter 1: Procedural Rules of the Board's rules" spoke of the regulations currently codified in Code § 105 (see Appendix A to that section, cross-referencing Board's previous numbering system).

But Code § 105 makes no provision for a stay of OMC's permit. Code § 105.102(b) provides for permit appeals within 30 days of IEPA's final issuance of a permit, while Code § 105.103(b) provides for "permit review[s]." Neither says anything on the subject of a stay, and nothing justifies the inferential granting of such relief in the face of such silence. Accordingly OMC must stand or fall on the already-discussed federal regulations that provide for stays during permit appeals taken within 30 days of permit issuance, but not during the pendency of modification requests.

By not appealing Special Condition 15 when its permit was issued in 1983, OMC took the risks that (1) its BMP program would not achieve a 1.0 ppb PCB goal by the time that limit took effect and (2) IEPA

---

19. Such appeals must be filed within 30 days of the date a permit is issued (Reg. § 124.74(a)). See also the Illinois state regulations requiring an appeal of a final IEPA action on a permit application within 30 days, Code § 309.181.

20. OMC's filings take the position that because IEPA never responded to its modification request, the issuance of the 1987 permit with the same contested 1.0 ppb PCB limit must be considered a denial of its modification request (see D. Ex. B, at 10). NRDC does not quarrel with that. It does seem reasonable to view IEPA's silence for almost three years as equivalent to a rejection of OMC's modification request.

would not then find any modification of the 1.0 ppb standard justified.[21] Even though the permit said OMC was not conceding "that reductions in effluent conditions beyond those achieved by the BMP program may be required," OMC risked being required to comply with a standard that would kick in at a specified date and that it felt it could not meet. It could (and should) have appealed the 1983 permit to have IEPA expressly incorporate a stay provision if OMC found itself forced to seek a modification pursuant to Special Condition 15. OMC has tendered no authority under the Act or the federal or state regulations to support a stay, other than for an appeal taken within 30 days of permit issuance.[22]

Accordingly this Court concludes the 1.0 ppb PCB standard remained operative despite OMC's October 1987 appeal. That being true, OMC cannot dispute the proposition that its alleged violations of that standard (leaving aside OMC's arguments going to the merits of those charges) were ongoing when NRDC filed suit.[23]

Much less discussion is needed as to the alleged pH violations. OMC rightly says NRDC has overstated the number of such violations. OMC's 1983 permit controlled the pH levels at outfalls 001, 006, 007 and 014 (D.Ex. B–2, at 2–6), with restrictions for outfalls 015 and 016 added by IEPA only in the 1987 renewal permit (D.Ex. B–1, at 3). That means NRDC's claims as to pH violations at outfalls 015 and 016 in 1985 must be dismissed. In turn that leaves only three pH violations at outfalls 006 in May and July 1987 to be tested under *Gwaltney* standards.[24]

■ OMC argues those three instances in over three years of monitoring do not classify it even as an "intermittent" violator of pH standards. It points to *Gwaltney*'s description of an intermittent violator as one that violates permit limitations one month out of every three (108 S.Ct. at 384). But OMC mistakes the thrust of the *Gwaltney* discussion of "intermittent" as opposed to "continuous" violators. What must be alleged in good faith is that defendant has not cured the source of discharge violations so that no more violations will occur. In *Gwaltney* the defendant had installed a new chlorination system and an upgraded wastewater treatment system before plaintiff even filed suit (108 S.Ct. at 379), so it appeared highly likely that there would be no more violations. Thus the Court was *not* considering whether any frequency of violation is necessary for jurisdictional purposes.

---

21. There was no ambiguity as to OMC's need to appeal promptly if it found *any* provision of the 1983 permit unsatisfactory. Appendix 1 to this opinion reproduces the notice to OMC that accompanied issuance of the 1983 permit (D.Ex. B–2), specifically calling OMC's attention to the short timetable for any appeal.

22. OMC's citation to *Borg–Warner Corp. v. Mauzy*, 100 Ill.App.3d 862, 870–71, 56 Ill.Dec. 335, 341, 427 N.E.2d 415, 421 (3d Dist.1981) does no more than support the conclusion that OMC's 1983 permit remained in effect while its 1987 permit was being contested. Moreover, that case was governed by the Illinois Administrative Procedure Act rather than Board's regulations, because it involved actions before October 1977 (when Board's rules were promulgated) (*id.* at 865, 56 Ill.Dec. at 337–38, 427 N.E.2d at 417–18).

23. Indeed an independent basis exists for finding jurisdiction under *Gwaltney*. NRDC filed suit in May 1987, and OMC did not appeal the denial *of its modification request until* October 1987. Even if OMC's argument about the legal effect of its October 1987 appeal were sound, the 1.0 ppb PCB standard was thus in effect when the Complaint was filed five months earlier. Hence the taking of the appeal bears not on this Court's original jurisdiction but on possible mootness.

24. NRDC resists the notion that the pH claims should be isolated in that manner, arguing instead that jurisdiction attaches to cases as a whole rather than to individual categories of permit violations (P.Mem. II–18–19). From that viewpoint NRDC need only allege that OMC remains in violation of some aspect of its discharge permit rather than each type of violation claimed. In terms of the Act's policies, it would indeed serve the statutory goals to allow a Section 1365 plaintiff to assert violations of effluent standards beyond those alleged to be ongoing (cf. *Public Interest Research Group of New Jersey, Inc. v. Carter–Wallace, Inc.*, 684 F.Supp. 115, 118–119 (D.N.J.1988) (once a plaintiff alleges an ongoing violation of an effluent standard, jurisdiction attaches and court can award penalties for wholly past violations)). However, this opinion need not reach that issue, because NRDC independently satisfies *Gwaltney* as to the pH violations.

OMC has violated the pH restrictions since this action was initiated. It has made no showing of having "put in place remedial measures that clearly eliminate the cause of the violation" (*Gwaltney*, 108 S.Ct. at 387 (Scalia, J., concurring)). To show the pH issue is moot, OMC "must demonstrate that it is '*absolutely clear* that the alleged wrongful behavior could not reasonably be expected to recur'" (*id.* at 386 (majority opinion), quoting *United States v. Phosphate Export Association, Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) and adding the emphasis to "absolutely clear"). In fact, no reason appears why NRDC cannot maintain a claim for even minor or infrequent violations of the Act. *Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480, 1490–91 (9th Cir.1987), *vacated*, — U.S. —, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988)[25] has noted there is no statutory exemption for de minimis or "rare" violations.

In summary, NRDC has satisfied the jurisdictional requirements identified in *Gwaltney* for citizen suits under Section 1365. Before this opinion turns to the merits, though, one final pellet in OMCs shotgun attack remains.

### Separation of Powers

OMC is not the first defendant to argue the Act's citizen suit provision violates the Constitution's separation of powers by placing authority for the enforcement of law outside the Executive Branch. Indeed, separation-of-powers arguments have generally experienced a recent revival—sometimes asserted successfully (see, e.g., *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (invalidating Gramm–Rudman–Hollings Budget Act) and the large block of recent District Court decisions striking down the Sentencing Guidelines promulgated under the Sentencing Reform Act, 28 U.S.C. §§ 991–998

(Supp.III 1985)), sometimes unsuccessfully (see, e.g., *Morrison v. Olson*, — U.S. —, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (upholding the independent counsel provision of the Ethics in Government Act of 1978) and the smaller group of decisions upholding the Sentencing Guidelines).

OMC invokes the concept that the authority to initiate a civil enforcement action is equivalent to the authority to execute laws—the exclusive province of the President and the Executive Branch. OMC cites both to the vesting of executive power in the President under Art. II, § 1, cl. 1 and to the Appointments Clause (Art. II, § 2, cl. 2), calling for appointment of "Officers of the United States" by the President with the approval of the Senate and appointment of "inferior Officers" by the President, courts or department heads. Clearly citizens bringing suit under Section 1365 are not appointed in compliance with the Appointments Clause.

That of course is just the first step in the analysis. What is more relevant is whether arguably executive functions, such as bringing a water pollution enforcement action, can be given *only* to duly appointed members of the Executive Branch or whether private citizens may also be allowed to bring such actions.

Where OMC's argument derails is in its exclusive reliance on cases that have interpreted the separation of powers requirement *as between branches of government.* *Buckley v. Valeo*, 424 U.S. 1, 138–41, 96 S.Ct. 612, 691–93, 46 L.Ed.2d 659 (1976) dealt in part with the congressional role in the appointment of the Federal Election Commission, a body that performed an executive function by bringing civil enforcement actions. Similarly, *Bowsher* struck down the Balanced Budget and Emergency Deficit Control Act of 1985 (Gramm–Rudman–Hollings) because of the executive powers wielded by the Comptroller Gener-

---

**25.** OMC brought to this Court's attention the Supreme Court's vacation and remand of *Union Oil* for further consideration in light of *Gwaltney.* But there is no indication that was done to determine whether de minimis violations would fail to satisfy Section 1365. *Union Oil* poses a more straightforward *Gwaltney* problem, for

the Sierra Club's June 1984 suit was brought against violations occurring between 1979 and 1983 (813 F.2d at 1482, 1485). *Union Oil*'s analysis of how the Act deals with "rare" violations has not been sapped by the Supreme Court's remand.

al, an official who could be removed from office by Congress (106 S.Ct. at 3189–91). Each case thus presented "an attempt by Congress to increase its own powers at the expense of the Executive Branch" (*Morrison*, 108 S.Ct. at 2602: accord, *Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 652 F.Supp. 620, 624 (D.Md.1987); *Melcher v. Federal Open Market Committee*, 644 F.Supp. 510, 520 (D.D.C.1986), *aff'd on other grounds*, 836 F.2d 561 (D.C. Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2034, 100 L.Ed.2d 619 (1988)). Neither in those cases nor in any other did the Supreme Court consider whether granting private citizens the power to institute lawsuits constituted the impermissible vesting of executive authority. Despite the potentially far-reaching language employed in cases such as *Buckley*, the role of private actors was simply not an issue the Court was called upon to address.

Two courts that have expressly considered this argument have concluded Section 1365 does not violate the separation-of-powers doctrine. *Bethlehem Steel*, 652 F.Supp. at 623 found the defendant's argument that enforcement functions could be assigned only to the Executive Branch "fundamentally flawed." As already suggested here, the decision noted *Buckley* and *Bowsher* were concerned with Congress' encroachment on the province of the Executive Branch and not with a role for private parties (*id.* at 623–24). In dismissing the argument that citizen suits interfere with government enforcement actions, the opinion (*id.* at 625) quoted *Davis v. Passman*, 442 U.S. 228, 241, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846 (1979) for the principle that:

> Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition who may enforce them and in what manner.

*Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Co. (Monsanto I)*, 600 F.Supp. 1474, 1478–79 (D.N. J.1985) had earlier reached the same conclusion.

*Bethlehem Steel*, 652 F.Supp. at 624 correctly emphasized there is no possibility here of private litigants being subject to congressional control. Apart from the Section 1365 context, two other courts have found no flaw in arrangements that place what are far more clearly executive functions outside the Executive Branch. *Melcher*, 644 F.Supp. at 520–23 held the inclusion of private individuals on the Federal Reserve Board's Open Market Committee did not violate the Appointments Clause. *FTC v. American National Cellular, Inc.*, 810 F.2d 1511, 1513–14 (9th Cir.1987) concluded that enforcement powers given to independent regulatory agencies did not violate separation-of-powers considerations. And of course other federal statutes have incorporated citizen suit provisions (see, e.g., 16 U.S.C. § 1540(g), the Endangered Species Act). What may be more significant than the number of times Congress has enacted a citizen enforcement power[26] is that when the Supreme Court has been confronted with Section 1365 it has not even hinted at a lurking separation-of-powers problem (*Middlesex County Sewerage Authority*, 453 U.S. at 14–17, 101 S.Ct. at 2623–25).

Under the Act's structure the Executive Branch and state regulatory authorities retain primary enforcement responsibility. Section 1365(b) requires citizens to notify EPA and the state at least 60 days before filing suit and allows the suit to proceed only if neither of those authorities "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation or or-

---

**26.** Needless to say, the frequency with which Congress applies a statutory approach and the number of laws potentially affected were courts to find it invalid are irrelevant to whether the provision is in fact constitutional (*INS v. Chadha*, 462 U.S. 919, 944–45, 103 S.Ct. 2764, 2780–

81, 77 L.Ed.2d 317 (1983)). Congress must obey constitutional restrictions when carrying out its lawmaking responsibilities (*Buckley*, 424 U.S. at 132, 96 S.Ct. at 688), and repetition lends no sanctity to unconstitutionality.

der...." Effectively EPA and IEPA get the right of first refusal to bring an enforcement action. *Gwaltney*, 108 S.Ct. at 383 has said citizen suits "are meant to supplement rather than to supplant government action." *Bethlehem Steel*, 652 F.Supp. at 625 quotes the United States, as *amicus curiae* in *Monsanto I*, as saying it views citizen suits as a "valuable adjunct" to federal enforcement (it is hardly news, as *Bethlehem Steel* points out, that "the EPA and state agencies lack sufficient resources to bring all necessary actions") and feels the Executive Branch's enforcement interests are sufficiently protected.

OMC also contends citizen suits deny EPA and state authorities the civil equivalent of prosecutorial discretion.[27] As *Gwaltney* reminds us, such private rights of action, though congressionally conferred, are constitutionally limited to those who have standing in Article III terms. Congress decided that allowing strict enforcement of antipollution standards by those directly injured by violations of those standards was more important than giving sole discretion to the regulators (cf. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 547, 63 S.Ct. 379, 385, 87 L.Ed. 443 (1942) (Congress provided for qui tam informer's

suits[28] to force diligent prosecution of frauds committed against the United States)).[29] This Court can find no constitutional infirmity in that decision.

It is clear indeed that the citizen suit provision of Section 1365 does not violate the constitutional separation of powers. At long last this opinion is able to turn to the merits of the cross-motions for summary judgment.

### OMC's Summary Judgment Motion

██ OMC moves for summary judgment solely on the issue of whether its 1983 NPDES permit actually imposed an enforceable numerical limit on PCB discharges.[30] OMC contends the permit's numerical limit on PCB discharges must be read in conjunction with Special Condition 15, which mandated a process for PCB control rather than a strict limitation. As foreshadowed by the earlier discussion of Special Condition 15 and the effect of OMC's right to seek modification of the 1.0 ppb PCB limit, this Court concludes the 1983 permit established not simply a compliance procedure but also a strict ceiling on PCB discharges.

NRDC and OMC are fighting over the

---

**27.** Of course that is not literally true—*Bethlehem Steel*, 652 F.Supp. at 624 correctly points out the citizen plaintiff cannot institute *criminal* actions. Rather OMC attacks the private litigant's ability to seek (among other remedies) the imposition of fines payable to the United States. In that respect citizen-suit plaintiffs may indeed be viewed as "private attorneys general"—but it is nearly a complete answer to observe that *Middlesex County Sewerage Authority*, 453 U.S. at 16–17, 101 S.Ct. at 2624 specifically recognized that very status (and used that very label) without a hint that such private enforcement powers posed any constitutional concerns.

**28.** *Black's Law Dictionary* 1126 (5th ed. 1979) defines a "qui tam action" as one "brought by an informer, under a statute which establishes a penalty for the commission or omission of a certain act, and provides that the same shall be recoverable in a civil action, part of the penalty to go to any person who will bring such action and the remainder to the state or some other institution...."

**29.** Congress has also provided EPA the right to intervene as of right in any citizen suit (Section

1365(c)). That gives EPA the ability to join the suit and inform a court if it believes enforcement is inequitable or contrary to the furtherance of the Act's goals.

**30.** It is not entirely clear from OMC's filings on which issues it seeks summary judgment for itself, rather than simply opposing NRDC's motion for summary judgment. Confusion on that score stems from OMC's having combined in somewhat haphazard fashion its arguments for dismissal of the case, summary judgment in its favor and opposition to OMC's summary judgment motion. This Court has therefore looked to OMC's Rule 12(e) statement, which is designed to identify "material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law...." That statement reveals OMC's contention that there is no enforceable numerical PCB limit (¶¶ 4–6), but it makes no reference to the issues of analytic variability in PCB measurement or alleged double-counting of PCB violations. This opinion accordingly treats the latter items only as grounds in opposition to NRDC's summary judgment motion.

plain meaning of OMC's 1983 permit.[31] Each side maintains the permit on its face establishes that the 1.0 ppb PCB level was or was not an enforceable permit condition. OMC bases its argument on Special Condition 15 (quoted earlier in this opinion), which OMC views as requiring it to implement a BMP program to control PCB discharges, not as setting the 1.0 ppb ceiling as an independently enforceable permit condition.

Again OMC cites to the language that it was not conceding that "reductions in effluent conditions beyond those achieved by the BMP program may be required" (D.Ex. B–2, at 9). IEPA had the discretion, OMC maintains, to use flexible permit conditions rather than a strict effluent limit. That unusual approach was assertedly appropriate because of the minute levels of PCBs involved and OMC's contention that PCB discharges were due to "background sources such as OMC's intake water and rainwater" (D.Mem. I–35). OMC also says that had it believed the numerical PCB limit was separately enforceable, it would have appealed the permit in 1983 (J. Roger Crawford ("Crawford") Aff. ¶ 6).

NRDC responds that the 1983 permit clearly shows the 1.0 ppb figure was a "concentration limit" for PCB discharges. NRDC views Special Condition 15 as setting forth the grounds on which OMC could seek a modification of the permit. Under NRDC's view IEPA was not compelled to grant the modification, nor did the special condition purport to modify or suspend the strict effluent limit for PCBs.

OMC replies that under NRDC's interpretation the extensively negotiated Special Condition 15 becomes meaningless. OMC claims it already had the right to seek modification of the permit terms under either Standard Condition 6 (D.Ex. B–2, at 15) or Reg. § 122.41(f). It maintains the only tenable reading of the effluent limit in conjunction with Special Condition 15 is that the numerical target for PCBs was not enforceable.

This Court concurs with the parties' sole point of agreement—that the permit requirements can be interpreted as a matter of law. And although the permit is scarcely a model of clarity, OMC has offered no reading that makes any sense of why the permit includes a specific PCB effluent limit. As plain as day, the permit says (D.Ex. B–2, at 4) (emphasis added):

> From July 1, 1984 ... the effluent of the following discharge(s) *shall be* monitored and *limited at all times* as follows....

Then the permit lays out for the relevant outfalls that OMC's "concentration limit" for PCBs, both for 30–day average and daily maximum, is 1.0 ppb (*id.*, at 4–5).

Thus the permit unquestionably speaks of a specified limit—not a target or a goal or a desired level. OMC attempts to turn that day into night, somehow transmuting a limit into a non-limit. Under Special Condition 15 OMC was entitled to seek modification of the limit upon demonstration that its BMP program would not achieve its goal. As already discussed at length, neither its modification request nor its 1987 appeal to Board stayed the effect of the restriction.

OMC's contention that it would have appealed the 1983 permit immediately had it believed the PCB numerical limit would be enforced is undisputed but immaterial. What is important is what the permit by its terms required and what OMC was expressly told about its appeal rights (see Appendix 1), not what OMC may have mistakenly believed when the permit was issued. It is equally irrelevant that OMC said in Special Condition 15 that it did not concede that PCB results beyond the BMP achievements could be required. What controls is not the absence of a concession by OMC, but rather the fact that IEPA was not excusing violations of the 1.0 ppb limit.

Nor does such a reading of the permit render Special Condition 15 meaningless. That condition set up a compliance process and laid out specific grounds for possible modification of the permit, rather than the

---

31. As already explained, the 1983 permit governs all the alleged PCB violations (which began in October 1984). OMC's appeal stayed the 1987 permit, leaving the earlier permit still in force for the entire period at issue here.

generic and standardless modification provisions of the standard regulations.[32]

It must be concluded that OMC's PCB discharges at the relevant outfalls were in fact limited to 1.0 ppb from July 1, 1984 onward. That being so, OMC's motion for summary judgment on the PCB claims must be denied.

### NRDC's Summary Judgment Motion

NRDC's motion for summary judgment on the issue of liability can best be approached by first considering OMC's arguments in opposition to that motion. NRDC bases its motion on the monthly DMRs that OMC was required to submit to IEPA. As stated at the outset of this opinion, NRDC contends those DMRs establish 56 incidents since April 1984 where OMC exceeded its permit limitations. In response OMC urges:

1. Those DMRs do not conclusively establish PCB violations because the PCB results reported may not be accurate, in turn because currently available monitoring technology cannot reliably determine the true PCB level at such low levels of concentration.

2. NRDC incorrectly interpreted the DMRs and in eight instances double-counted a single alleged PCB violation.

Apart from those PCB-related questions (dealt with next in this opinion), this Court must also examine NRDC's entitlement to a determination of OMC's liability for the other violations dealt with earlier.

### 1. Monitoring Variability

▮▮▮▮ Normally a permit-holder's statements in its DMRs are conclusive and irrebuttable evidence that permit violations have occurred. Courts have almost uniformly rejected efforts by a claimed violator to impeach the data in its own DMRs in later enforcement proceedings (see, e.g., *Union Oil*, 813 F.2d at 1492). Clearly a court cannot accept a defense based simply on error or sloppiness in laboratory practices (*id.*), for the Act relies on accurate moni-

toring by dischargers and they will be held accountable for the data they collect and report (*id.; Bethlehem Steel*, 608 F.Supp. at 452–53).

But OMC's argument here is significantly different from the normal contention by a defendant that its monitoring results are incorrect for one reason or another. What OMC says is not that it was inaccurate or negligent in its practices but rather that current monitoring technology cannot render reliable the reported results as to PCB levels at such low levels of concentration.

OMC has not simply made a "last minute claim" that there are problems with PCB monitoring (see *Fritzsche, Dodge & Olcott*, 579 F.Supp. at 1538–39). Beginning in 1984 OMC stated, in cover letters accompanying its DMRs (see D.Ex. D–4), that the true PCB level in its samples may be below 1.0 ppb despite the higher numbers reported. OMC also offers the affidavit of Dr. Kenneth Crumrine ("Crumrine"), an environmental engineer who has consulted with OMC on PCB monitoring, to explain the difficulties in analyzing the PCB content of OMC's effluent at the extremely low levels of concentration regulated in its permit (contrast *Fritzsche, Dodge & Olcott*, 579 F.Supp. at 1538, where "[d]efendant's speculations were unaccompanied by any direct evidence of reporting inaccuracies"):

3. I find the PCB concentration limit in the permit of 1.0 part per billion (ppb) to be below the concentration level where wastewater characterization can be reliably determined using state-of-the-art monitoring procedures.

\* \* \* \* \* \*

15. It is my opinion that most, if not all, previous effluent monitoring data for PCBs reported by Outboard Marine Corporation that exceeded permit concentration limits of 1.0 ppb may have been the result of sampling and analysis variation and not additional discharge of PCB containing wastewaters. Results reliable enough to support a definite finding of

---

**32.** OMC's non-concession, as stated in Special Condition 15, may have some relevance in the present proceeding. Its contention that it complied with its BMP program may perhaps bear upon the calculation of what penalty is appropriate for any violation found in this action.

exceedances of the 1.0 ppb limitation cannot be obtained.

NRDC does not attempt to contradict the Crumrine opinion.[33] Instead it argues the technical accuracy of OMC's monitoring is not properly cognizable in an enforcement proceeding. NRDC relies principally on *Connecticut Fund*, 660 F.Supp. at 1416–17, which rejected defendant's argument that its measurement technique had overstated some of its discharge. There defendant had produced evidence of additional sampling done by EPA using a more accurate technique and showing lower discharges (*id.*). That argument was found wanting as a matter of law, on the grounds that no scientific measurement is perfect and that Congress did not intend courts to be the fora for evaluating the accuracy or adequacy of scientific measurements (*id.*).

Quite apart from whether this Court would concur in the *Connecticut Fund* reasoning and result, they cannot control here. First, *Connecticut Fund* gives no indication that the defendant had maintained all along (as did OMC) that its monitoring technique was necessarily deficient. OMC is not simply raising an issue to evade enforcement, undercutting the use of DMRs as a simple, swift and accurate enforcement technique. More importantly, in *Connecticut Fund* alternate measurement technology was available that would have given accurate readings, while here OMC says it had no alternatives. If the Crumrine affidavit is to be believed (as it must be for present purposes), OMC made the most accurate measurements possible, but the results (given the current state of technology) are not sufficiently accurate for this Court to determine whether OMC has in fact violated its permit.

 Accordingly this Court finds OMC has demonstrated the existence of a material factual issue as to whether its discharges in fact exceeded 1.0 ppb. This

conclusion does not necessarily prevent enforcement of OMC's PCB limit. At trial NRDC will have the opportunity to present its own evidence and expert opinion that OMC's monitoring results do show violations of the 1.0 ppb limit in some or all of the contested instances. *Students Public Interest Research Group of New Jersey, Inc. v. AT & T Bell Laboratories*, 617 F.Supp. 1190, 1205 (D.N.J.1985) puts NRDC's burden in these terms:

> We note that no scientific measurement is ever absolutely perfect, however, the preponderance of the evidence standard requires plaintiffs to show only that it is more likely than not that the DMR test results violate permit limitations.

For now, however, that showing has not been made as a matter of law.

### 2. Double–Counting of PCB Violations

 OMC does not fare as well in its attempt to strike eight of the claimed PCB violations.[34] It claims NRDC cannot take the results from a single storm event and consider them to violate both the daily maximum for PCB discharge *and* the 30–day average daily limit (D. Mem. I–39; Anthony Montemurro Aff. ¶ 5). NRDC's response is curious. For some reason it contends it has not actually double-counted violations of *TSS* levels, an argument OMC has not advanced. NRDC makes no response at all as to over-counting *PCB* violations. Nonetheless this Court finds NRDC's substantive response equally applicable to the argument OMC has actually made.

NRDC correctly points out OMC's permit restricts both maximum daily discharges and the average daily discharge over a 30–day period for certain effluents, including PCBs. OMC's permit defines "Average Monthly Discharge Limitation (30 day average)" as (D.Ex. B–2, at 15):

---

**33.** Even if it had done so in factual terms, for summary judgment purposes OMC's version of the facts (in the form of the Crumrine affidavit) would have had to be credited.

**34.** At least on the current motions for summary judgment and injunctive relief, OMC's stress placed on this issue is puzzling indeed. With

the numerous violations that would remain even if OMC were right, this is clearly a classic illustration of a nonmaterial (that is, non-outcome-determinative) factual dispute. Does it really matter whether OMC is to be hanged for stealing a sheep or for stealing a lamb?

the highest allowable average of daily discharges over a calendar month, calculated as the sum of all daily discharges measured during a calendar month divided by the number of daily discharges measured during that month.

If OMC believed the PCB count during a storm event was unrepresentative of its daily discharges over a given month, it could have taken additional samples to bring down the monthly average. Where a single sample is taken in a given month and exceeds 1.0 ppb, that violates both the daily and monthly limitation. This same argument was presented in *AT & T Bell Laboratories,* and the court agreed a single sample could violate both permit conditions and establish two violations (617 F.Supp. at 1204–05).

OMC's reply simply points out NRDC's error about which category of violations were in issue (D.Mem. II–7 n. 4). It offers no response to the substance of NRDC's argument about how the permit is to be interpreted. Thus OMC has failed to raise a genuine factual issue as to the number of claimed PCB violations.[35]

### 3. NRDC's Right to Summary Judgment

■ That leaves for consideration whether summary judgment in NRDC's favor on the issue of liability is appropriate. It is uncontested that permit-holders are strictly liable for violations of an NPDES permit (*United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir.1979)). Section 1369(b)(2) provides the substantive requirements of OMC's permit are not reviewable in a civil or criminal enforcement proceeding. Courts have frequently decided liability under the Act can properly be established via motion for summary judgment (see *Monsanto II,* 600 F.Supp. at 1485). If NRDC has demonstrated the absence of a genuine issue of material fact on that score, it is entitled to summary judgment (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986)).

With the alleged PCB violations forced to await trial, only the TSS and pH issues need current consideration in summary judgment terms. They may be dealt with quickly.

As to TSS violations, this opinion has already decided the 1983 permit and its 15 mg/liter ceiling on TSS discharges remains in effect. OMC says its outfalls 015 and 016, to which the TSS limits apply, consist solely of storm-water runoff and do not contain "process water" (D.Mem. I–48). It argues the "solids" in the discharge of those outfalls are primarily coal dust and sand, substances it does not use or generate in its operation (*id.*). Thus it claims no responsibility for the TSS levels in its effluents (and it contests the continued regulation of this standard in its appeal to Board). But this opinion has already held (in accordance with uniform case law) that OMC cannot contest the substantive restrictions of an NPDES permit in an enforcement action. OMC is strictly liable for the 17 times it exceeded the TSS limit between April 1984 and July 1987 (see D.Ex. D–1).

As for pH violations, OMC contested this Court's jurisdiction under *Gwaltney* but offered nothing to oppose liability on the merits. This opinion has earlier found two of the claimed pH violations must be dismissed because the pH level was not restricted at the involved outfalls at the relevant time. OMC is held liable for the three remaining times it exceeded the permitted pH range (see D.Ex. D–1).

### Injunctive Relief

■ That leaves one final question: the propriety of injunctive relief. NRDC seeks an injunction ordering OMC to comply with its NPDES permit as now written or as modified in the future (P.Mem. II–10). OMC objects principally to an injunction concerning the PCB restrictions it has been seeking to modify for almost four years. That issue is necessarily premature until it

---

**35.** As n. 4 reflects, OMC has demonstrated (and NRDC does not contest) that two alleged PCB violations in March 1987 DMR were merely clerical errors. That correction leaves a total of 34 claimed PCB violations in issue (see n. 34).

has been determined whether PCB violations have indeed occurred.

But OMC also objects to an injunction covering TSS levels, which it is seeking to have deregulated—and even though it has said nothing about the pH standards beyond its jurisdictional arguments, it certainly has not agreed to an injunction in that area either. This Court is therefore called on to consider now whether an injunction should issue as to the TSS and pH standards in light of OMC's adjudicated violations. What must be examined is whether OMC has raised any factual issues to bar issuance of an injunction based on NRDC's motion for summary judgment.[36]

In citizen suits a court is authorized to enjoin violations of the Act as well as to award civil penalties payable to the United States Treasury (Section 1365(a); *Gwaltney*, 108 S.Ct. at 379). When Congress expressly authorizes such injunctive relief, that brings into play a different set of factors from those in the court-created setting. *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979) (citations omitted) put the lower threshold in these terms:

> Actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence. Once a violation is demonstrated, the moving party need show only that there is some reasonable likelihood of future violations.

To be sure, courts are not obligated to enjoin violations of the Act in a mechanical or automatic fashion (*Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982)). *Weinberger, id.* at 320, 102 S.Ct. at 1807 went on to hold:

We do not read the [Act] as foreclosing completely the exercise of the court's discretion. Rather than requiring a district court to issue an injunction for any and all statutory violations, the [Act] permits the district court to order that relief it considers necessary to secure prompt compliance with the Act. That relief can include, but is not limited to, an order of immediate cessation.

Hence this Court is entitled to apply equitable considerations in seeing whether an injunction should issue.

Certainly NRDC has made out its case in support of an injunction in both statutory and equitable terms. OMC has been held liable for violations of TSS and pH standards. Violations in both respects have occurred since NRDC filed this suit, and OMC has neither asserted nor presented evidence to indicate that additional violations will not recur in the future. These conclusions satisfy the prerequisites for an injunction under the Act (contrast *Locust Lane v. Swatara Township Authority*, 636 F.Supp. 534, 539 (M.D.Pa.1986) (although defendant was found to have violated its permit, injunctive relief was denied because defendant was "currently in compliance ... and there is no evidence that a violation ... is reasonably expected to recur")). No equitable considerations are present to militate against injunctive relief.

OMC proffers numerous arguments against an injunction as to PCB violations. It urges little or no harm is caused by its PCB discharge, compared to the cost and difficulty of attempting to comply with a 1.0 ppb standard (D.Mem. I–44–45). And this opinion has earlier discussed OMC's efforts to comply with the PCB target, as well as its multi-year quest for modification of the permit when it found the PCB standard could not feasibly be attained. Those issues (and relatedly the delay by the Illi-

---

36. D.Mem. I–42 points out that NRDC has not limited its summary judgment motion to the issue of liability and comments:

> Unlike the result in most reported Clean Water Act citizen suit cases, NRDC is also seeking an injunction directing "OMC to cease forthwith from further violation of the Federal Water Pollution Control Act."

Perhaps few citizen plaintiffs seek injunctive relief under the Act by way of summary judgment, but most citizen suits do ask for injunctions as part of the overall prayer for relief (see, e.g., *Connecticut Fund*, 660 F.Supp. at 1401). In any event, the issue is one of NRDC's entitlement in *this* case, and not what the situation may have been in any (or even most) other cases.

nois regulatory authorities in response to OMC's modification request) will be ripe for consideration if and when PCB violations are proved and injunctive relief on that score must be considered.

For the present, though, OMC's arguments are largely inapplicable to TSS violations and wholly inapplicable to pH violations. It tenders nothing more than a conclusory assertion that the difficulty of complying with TSS standards outweighs any benefit (D.Mem. I–49):

> [I]f OMC undertook to comply with the TSS limitation in its 1983 permit, it would require the expenditure of considerable effort and expense.

Even apart from the total absence of any evidence to support that factual assertion, OMC is disputing the merits of TSS restrictions before the wrong tribunal. In essence OMC says TSS discharges from its plant should not be restricted because it is not responsible for the solid materials in its discharge (D.Mem. I–48–49). But as already pointed out more than once, OMC did not appeal its 1983 permit, and it never applied for modification or removal of the TSS standard when it found IEPA had not removed the restriction after a period of monitoring.

This Court will not go back to square one to review whether the permit's TSS restrictions furthered the goals of the Act.[37] OMC had its shot before IEPA to argue against TSS restrictions on the merits. It may perhaps succeed in having TSS restrictions removed for the future, but that does not support its failure to comply with the permit as it now stands. And as for its pH violations, OMC has offered nothing as to why this Court should not enforce the restrictions in the permit as written.

OMC is equally unsuccessful in contending NRDC's summary judgment motion provides an insufficient basis on which to enter an injunction. All OMC offers on that subject is that it has uncovered no case in which a court has ordered an injunction by way of summary judgment (D.Mem. II–13 n. 5).[38] But there is nothing at all to suggest that injunctive relief is somehow foreclosed on a summary judgment motion.[39]

This Court has applied the garden variety Rule 56 considerations to see whether disputed issues of material fact mandate a trial or other evidentiary hearing. Review of OMC's submissions under General Rules 12(e) and (f), as well as its other submissions, reveal no such factual issues relevant to injunctive relief (or to the merits already resolved in this opinion). No purpose would be served by delaying an injunction pending further proceedings.

NRDC is therefore directed to submit, on or before July 22, 1988, a proposed form of permanent injunction order mandating OMC's compliance with the TSS and pH restrictions in its NPDES permit. On or before August 1, 1988 OMC shall file its comments on NRDC's draft (without rearguing issues resolved in this opinion). This Court will then issue the appropriate order.

---

37. *City of Milwaukee v. Illinois,* 451 U.S. 304, 326, 101 S.Ct. 1784, 1797, 68 L.Ed.2d 114 (1981) said in a related context:

> The statutory scheme established by Congress provides a forum for the pursuit of such claims before expert agencies by means of the permit-granting process. It would be quite inconsistent with the scheme if federal courts were in effect to "write their own ticket" under the guise of federal common law after permits have already been issued....

38. *Sierra Club v. Raytheon,* 22 Env't Rep.Cas. (BNA) 1050 (D.Mass.1984) [available on WEST-LAW, 1984 WL 2239] did consider entering an injunction on plaintiff's summary judgment motion. There the court stopped short of granting that relief, but it ordered *Raytheon* to file "with-in 30 days of this order a plan to comply with all effluent standards," stating that if Raytheon failed to comply "the plaintiffs may apply to this Court for an injunction which shall issue promptly" (*id.* at 1055).

39. On the contrary, this Court has frequently reminded litigants that summary judgment is a substitute for trial (or more precisely a demonstration that no evidentiary trial is needed because no material facts are in dispute) (see, e.g., *Teamsters Local 282 Pension Trust Fund v. Angelos,* 649 F.Supp. 1242, 1252 (N.D.Ill.1986), *aff'd,* 839 F.2d 366 (7th Cir.1988)). And if a plaintiff is entitled to an injunction after winning at trial (which is a given), why should the same result not follow a winning and equally dispositive summary judgment motion?

*Conclusion*

OMC's motion to dismiss or stay the present action is denied because:

1. NRDC has demonstrated its standing to sue on behalf of its members.

2. Primary jurisdiction and abstention doctrines are not applicable.

3. NRDC has satisfied the *Gwaltney* jurisdictional requirement.

4. No violation of the Constitution's separation of powers is created by the citizen suit provisions of the Act.

OMC's motion for summary judgment is denied because of the existence of a factual dispute. As for NRDC's summary judgment motion:

1. There is no genuine issue of material fact, and NRDC is entitled to a judgment as a matter of law, as to OMC having violated the TSS and pH restrictions of its NPDES permit on 20 occasions.

2. Summary judgment is denied as to OMC's claimed PCB violations, by reason of a genuine factual dispute as to whether OMC has in fact exceeded the PCB standard.

Finally, this Court will permanently enjoin further violations by OMC of the permit restrictions on TSS and pH levels. As already indicated, the parties are to submit proposals as to the form of that order, following which the injunction will be issued. This action is then set for a status hearing at 9 a.m. August 15, 1988, to discuss the timetable for resolving the remaining issues in the case.

## APPENDIX 1

 Illinois Environmental Protection Agency · 2200 Churchill Road, Springfield, IL 62706

---

217/782-0610

Outboard Marine Corporation
Waukegan
NPDES Permit No. IL0002267
Final Permit

*COPY*

SEP 1 5 1983

Outboard Marine Corporation
100 Sea-Horse Drive
Waukegan, Illinois 60085

Gentlemen:

Attached is the final NPDES Permit for your discharge. The Permit as
issued covers discharge limitations, monitoring, and reporting
requirements. The failure of you to meet any portion of the Permit could
result in civil and/or criminal penalties. The Illinois Environmental
Protection Agency is ready and willing to assist you in interpreting any
of the conditions of the Permit as they relate specifically to your
discharge.

The Permit as issued is effective as of the date indicated on the first
page of the Permit. You have the right to appeal any condition of the
Permit to the Illinois Pollution Control Board prior to the effective
date.

Should you have questions concerning the Permit, please contact Ray
Ehrhard at the telephone number indicated above.

Very truly yours,

Thomas G. McSwiggin, P.E.
Manager, Permit Section
Division of Water Pollution Control

TGM:LWE:RAE:jab/6698C

Enclosure: Final Permit

cc: USEPA/With Enclosure
 Region 2/With Enclosure
 Permit Section
 Records Unit
 Consulting Engineer

RECEIVED

SEP 1 9 1983

OMC ENVIRONMENTAL
CONTROL DEPT.